# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| RE/MAX International, Inc., ) | |
| Plaintiff, ) | |
| ) | **CIVIL ACTION NO. 4:07-CV-02426** |
| v. ) | |
| TREND SETTER REALTY, LLC, ) a Texas limited liability company; ) | |
| PAVNOUTY ABRAHAM, an individual; ) | |
| and ) | |
| DEBORAH N. MILLER, an individual ) | |
| Defendants. ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| RE/MAX INTERNATIONAL, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| ) | |
| VS. ) | CIVIL ACTION NO. |
| ) | 4:07-CV-02426 |
| TREND SETTER REALTY, LLC, ) | |
| A Texas Limited Liability ) | |
| Company; ) | |
| ) | |
| PAVNOUTY ABRAHAM, an ) | |
| individual; and ) | |
| ) | |
| DEBORAH N. MILLER, an ) | |
| individual, ) | |
| ) | |
| Defendants. ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF DEBORAH MILLER
MAY 29, 2008
Volume 1 of 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF DEBORAH MILLER, produced as a

witness at the instance of the PLAINTIFF AND

COUNTERDEFENDANT, RE/MAX INTERNATIONAL, INC., and duly

sworn, was taken in the above-styled and numbered cause

on the 29th day of May, 2008, from 1:04 p.m. to 4:11

p.m., before Misty Fondren Clements, CSR in and for the

State of Texas, reported by machine shorthand, at the

Law Offices of Greenberg Traurig, L.L.P., 1000 Louisiana

**Page 2**

```
 1   Street, Suite 1800, Houston, Texas 77002, pursuant to
 2   the Federal Rules of Civil Procedure and the provisions
 3   stated on the record or attached hereto.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            APPEARANCES
 2
 3   FOR THE PLAINTIFF and COUNTERDEFENDANT, RE/MAX
     INTERNATIONAL, INC.:
 4
       Mr. John R. Posthumus
 5     GREENBERG TRAURIG, L.L.P.
       The Tabor Center
 6     1200 17th Street
       Suite 2400
 7     Denver, Colorado 80202
       Ph: (303) 572-6500  Fax: (303) 572-6540
 8     Email: posthumusj@gtlaw.com
 9
10   FOR THE DEFENDANT and COUNTERPLAINTIFF, TREND SETTER
     REALTY, LLC, A TEXAS LIMITED LIABILITY COMPANY; PAVNOUTY
11   ABRAHAM, AN INDIVIDUAL; AND DEBORAH N. MILLER, AN
     INDIVIDUAL:
12
       Mr. Mayur Patel
13     HESTER & PATEL, P.C.
       14511 Falling Creek Drive
14     Suite 403
       Houston, Texas 77014
15     Ph: (281) 586-7999  Fax: (281) 586-7997
       Email: mpatel@hesterpatel.com
16
17   ALSO PRESENT:
18     Mr. Adam Lindquist Scoville, Senior Counsel
       RE/MAX International, Inc.
19
       Mr. Abraham Pavnouty
20
21
22
23
24
25
```

**Page 4**

```
 1                  INDEX
 2                                             PAGE
 3   Appearances............................3
 4   Stipulations...........................5
 5
 6   DEBORAH MILLER
 7     Examination By Mr. Posthumus.........6
 8     Examination By Mr. Patel.............125
 9
10   Signature and Changes..................127
11   Reporter's Certificate.................129
12
13
14
15                EXHIBITS
16   NO.    DESCRIPTION                      PAGE
17   23   Copy of RE/MAX Yard Sign............37
18   24   Letter to Ad-Mar from D. Miller with Trend Setter
19        Realty Dated 4-26-05................60
20   25   Notice of Deposition of Deborah Miller..........108
21   26   Copy of Two Business Cards for Deborah Miller
22        of Trend Setter Realty..............121
23
24
25
```

**Page 5**

```
 1             STIPULATIONS
 2        The parties in the above entitled and numbered
 3   cause agree that the Deposition shall be taken pursuant
 4   to the Federal Rules of Civil Procedure.
 5        The parties agree that all objections as to
 6   the form of the question and the responsiveness of the
 7   answer are to be made at the time of the taking of said
 8   deposition; but that all other objections are reserved
 9   and may be made at the time this deposition, or any part
10   thereof, is offered on the trial.
11        The parties further agree when said deposition
12   has been transcribed, it will be forwarded to the
13   witness or attorney for the witness for examination,
14   notarization and signature and is to be returned to the
15   reporter.  If the deposition is not returned to the
16   reporter, an unsigned copy can be used at the time of
17   trial with the same force and effect as though the
18   original had been read and signed.
19
20
21
22
23
24
25
```

## Page 6

1            DEBORAH MILLER,
2  having been first duly sworn, testified as follows:
3            EXAMINATION
4  BY MR. POSTHUMUS:
5     Q. Good afternoon. My name is John Posthumus. I
6  represent RE/MAX International in connection with a -- a
7  dispute involving Trend Setter Realty, Pavnouty Abraham
8  and -- and yourself, Deborah Miller. If you could state
9  your name for the record and spell your last name.
10    A. Deborah Miller, M-I-L-L-E-R.
11    Q. And, Ms. Miller, are you a resident in the
12 Houston area?
13    A. Missouri City, Texas.
14    Q. Okay. Is that within 100 miles of Houston?
15    A. Oh, yeah. Uh-huh.
16    Q. Just, please, state your address for the
17 record.
18    A. 4910 McKeever Lane, Missouri City, Texas,
19 77459.
20        MR. PATEL: And let him finish the
21 question before you answer.
22    Q. (By Mr. Posthumus) Have you been deposed
23 before?
24    A. A long time ago.
25    Q. Okay. Let me go through a couple of just

## Page 7

1  guidelines that if we follow will make the job of the
2  court reporter a lot easier.
3     A. Okay.
4     Q. The court reporter is here to record in a
5  stenographic fashion everything that's said in the room,
6  and so in order for her to do that successfully, it's
7  very important that we not talk over each other or
8  interrupt each other. So if you could allow sufficient
9  time for me to complete my question and I'll allow
10 sufficient time for you to complete your answer, it will
11 make it a lot easier for the court reporter to record
12 the testimony today. Do you understand that?
13    A. Uh-huh.
14    Q. Okay. And the other thing that I need to have
15 you do is, because the court reporter is recording what
16 is said, that we have to have a verbal response or some
17 type of verbal indication of what is being said in the
18 room. So say "Yes" or "No" or provide an answer, but
19 avoid nods of the head or uh-huh's or those types of
20 things --
21    A. Okay.
22    Q. -- so that that can be accurately recorded.
23 Do you --
24    A. Yes.
25    Q. Do you understand that? Okay.

## Page 8

1  You're entitled to clear questions, and
2  occasionally I will kind of ask questions that may not
3  make any sense or certainly, you know, may not make any
4  sense to you. So if you don't understand the question,
5  please ask me or please tell me and I'll try to rephrase
6  it in a way that is understandable to you.
7        If you don't say anything, I'll presume that
8  you understood my question and you're responding to my
9  question. Is that okay with you?
10    A. Okay.
11    Q. Feel free to let us know if you ever want to
12 take a break. This is not a marathon. You know, we're
13 going to probably try to take breaks every hour, hour
14 and a half, just to keep the pace going. But if -- if
15 for any reason you need to take a break, please let us
16 know and we'll go off the record.
17    A. Okay.
18    Q. If you need to confer with counsel for any
19 reason, please let me know and we'll take time to do
20 that as well.
21       How long -- are you presently employed by
22 Trend Setter Realty?
23    A. Yes.
24    Q. And for how long have you been employed?
25    A. Since March of 2005.

## Page 9

1     Q. And since March of 2005 have you been
2  continuously employed by Trend Setter Realty?
3     A. Yes, I have.
4     Q. And what position do you currently maintain
5  with Trend Setter?
6     A. Sponsoring broker.
7     Q. And throughout the time that you've been with
8  Trend Setter, has your position been sponsoring broker?
9     A. Yes.
10    Q. Have you held any other positions?
11    A. Not that I recall. I'm called Jack of all
12 trades sometimes, but...
13    Q. What are your responsibilities as sponsoring
14 broker?
15    A. Besides the sponsorship through TREC, I sign
16 up agents as they come in. I review contracts. I walk
17 agents through contracts, training, when it's necessary,
18 pretty much to answer questions that agents have.
19       I have a few of my own listings, very few, and
20 I have a few of our agents that are owner agents that I
21 have their listings.
22    Q. When you say, "owner agents," what do you mean
23 by that?
24    A. In order to be covered by E & O insurance, you
25 must have an arm's length transaction so that someone

3 (Pages 6 to 9)

LEGALPARTNERS, L.P.     713-935-1600
269681b8-a6c3-4873-a158-9c52a0f99ac9

Page 14

1   A. Uh-huh.
2   Q. And how long were you there?
3   A. Right at a year. Actually, they hold my
4   license from 1990, once I got my license, but I didn't
5   practice until '91, so actually they held it for --
6   Q. A couple of years?
7   A. Uh-huh.
8   Q. And then after -- and that would have been
9   here in the Houston area? ERA Keenan?
10  A. Sugar Land, which is close enough to...
11  Q. I'm not -- you'll have to forgive me. I'm not
12  that familiar with the Houston area. How far out is
13  Sugar Land in terms of miles from, let's say, downtown
14  Houston?
15  A. Gosh. 25-minute ride, maybe, 30, 30-minute
16  drive maybe.
17  Q. Okay.
18      MR. PATEL: 20 miles, I'd say, 15 or 20
19  miles.
20  Q. (By Mr. Posthumus) So you would consider
21  Sugar Land a suburb of Houston?
22  A. Uh-huh.
23  Q. Would that be appropriate?
24  A. Yes, sir.
25  Q. All right. And after -- you indicated that

Page 15

1   you left Keenan at some point in 1991?
2   A. Uh-huh.
3   Q. Where did you go after that?
4   A. RE/MAX Heritage.
5   Q. And where was that RE/MAX Heritage located?
6   A. Sugar Land.
7   Q. And do you know who the broker of record was
8   there at that time? Do you recall?
9   A. You know, I'll just -- I'll just say that you
10  guys were so busy swapping around owners and that --
11  that almost closed down and it went through ownership
12  change, broker change. I can't tell you who it
13  finally -- I mean, it was a mess at that particular
14  location. So I am not sure who the broker was. I'm
15  sorry. It changed several times during that
16  transitional time period.
17  Q. Okay. How long -- how long were you there?
18  A. About two years.
19  Q. So from 1992 to about sometime in 1994?
20  A. Uh-huh.
21  Q. And then what happened after that?
22  A. I was in the process of building a house. I
23  took a -- I moved my license to Equity Group for about
24  six months because I didn't really want to practice very
25  much while I was building. Then I moved straight over

Page 16

1   to Keller Williams.
2   Q. So Keller Williams may be in about 1995 or
3   thereabouts?
4   A. '95, yeah, '95, '96, somewhere around there.
5   I'm not sure of the years. I'd have to go back and
6   look.
7   Q. Okay. Equity Group, what -- who are they?
8   A. It's no more.
9   Q. Okay.
10  A. It was a one-man shop.
11  Q. Just a one-man real estate --
12  A. Uh-huh.
13  Q. -- brokerage?
14  A. Yeah, just needed somebody to hold my license
15  while I was building a house and didn't want to mess
16  with anything.
17  Q. Sure. And then Keller Williams where?
18  A. Sugar Land, also.
19  Q. Sugar Land, also? Okay.
20  A. And it was Keller Williams, Sugar Land, was
21  the name of it, so...
22  Q. How long were you at Keller Williams?
23  A. I was at Keller Williams from '96 through '97
24  because I think -- yeah, I think '95 -- '95 and --
25  '95 -- let's see, '94 or '95 because I wasn't with

Page 17

1   Equity Group very long, '94 or '95. '96 and '97 was
2   Keller Williams.
3   Q. And then what did you do after Keller
4   Williams?
5   A. Realty Executives for -- through '99.
6   Q. So '97 to '99?
7   A. Uh-huh.
8   Q. Approximately two years?
9   A. Uh-huh. Every one of them were close to two
10  years, two to two and a half years, except for Equity
11  Group.
12  Q. And then so Realty Executives, was that in
13  Sugar Land?
14  A. Uh-huh.
15  Q. And then what happened when you left Realty
16  Executives in '99?
17  A. I went to RE/MAX Fine Properties.
18  Q. And how long were you there?
19  A. A couple of years.
20  Q. So '99 to 2001?
21  A. Whenever -- whenever I signed on with
22  Realty -- excuse me -- RE/MAX Elite, whenever I signed
23  on there. I don't remember. You can back into that.
24  Q. Okay. That's when you --
25  A. I went from RE/MAX Fine Properties to RE/MAX

Page 18

1  Elite.
2      Q. That's your next stop?
3      A. Uh-huh.
4      Q. That would have been --
5      A. I know -- I know where I was. I apologize. I
6  don't know my years without going back and trying to
7  figure them out.
8      Q. Oh, no. It's -- yeah. No, I understand.
9          So from about '01 to about '03 or thereabouts?
10     A. Uh-huh.
11     Q. I'm sorry. You were at RE/MAX Fine Properties
12 until about '03?
13     A. To '01.
14     Q. And then what happened after RE/MAX? You went
15 to Elite?
16     A. Elite. Well, wait a minute. Let's see.
17     Q. I think you started at Elite, according to the
18 contract, maybe in '03?
19     A. Okay. Then it was 2000 that I went to RE/MAX
20 Fine Properties, not '99, to '03. There you go.
21 Because if I went to Elite in '03, then that would have
22 been right.
23     Q. Okay.
24     A. Like I said, I have to back into the years.
25     Q. Right. And then you were at RE/MAX Elite

Page 19

1  until you joined Trend Setter in '05. Would that be
2  accurate?
3      A. Yeah.
4      Q. In March of '05?
5      A. Yeah, I was there.
6      Q. But that's where your license was?
7      A. Uh-huh.
8      Q. Right?
9      A. Yes, sir.
10     Q. And RE/MAX Elite, where is that located?
11     A. It's actually Stafford, which is next to Sugar
12 Land and about two miles closer to Houston.
13     Q. Okay. And RE/MAX Fine Properties, where was
14 that located?
15     A. Sugar Land.
16     Q. Okay. And so let's -- at ERA Keenan you acted
17 as an -- as a sales associate?
18     A. Yes, I did.
19     Q. And was that on an independent contractor
20 basis?
21     A. Yes.
22     Q. And did you hold any other positions with ERA
23 Keenan?
24     A. No, sir.
25     Q. The position you held with RE/MAX Heritage in

Page 20

1  '92, was that as a sales associate position?
2      A. Yes, sir.
3      Q. And did you hold any other position?
4      A. No, sir.
5      Q. And that was on an independent contractor
6  basis?
7      A. Yes, sir.
8      Q. With Keller Williams, a sales associate again?
9      A. Again.
10     Q. And on an independent contractor basis?
11     A. Yes, sir.
12     Q. I guess the same two questions for Realty
13 Executives. A sales associate position?
14     A. Yes.
15     Q. And an independent contractor basis?
16     A. Yes.
17     Q. And then for RE/MAX Fine Properties, it was a
18 sales associate position?
19     A. Correct.
20     Q. And an independent contractor basis?
21     A. Uh-huh.
22     Q. Okay. Now, there came a time at some point
23 where you obtained your broker license; is that correct?
24     A. Yes, I got it. I got it the -- when I joined
25 RE/MAX Elite.

Page 21

1      Q. So about 2003?
2      A. Uh-huh. Yes, sir.
3      Q. And was there a -- a particular reason that
4  you obtained your broker license at that point?
5      A. Not really. I just decided I would like to
6  have it, just in case I ever wanted to retire and take
7  my license home and...
8      Q. I'm not --
9      A. They were supposed to also increase the
10 requirements the following year and I thought I might as
11 well go ahead and get it before they raised all the
12 additional education and all the other stuff they were
13 talking about doing.
14     Q. Okay. This is part of obtaining the license?
15     A. Correct.
16     Q. The requirements for obtaining the license?
17     A. Correct.
18     Q. Okay. So what -- if you could just briefly
19 describe for the record what is involved with obtaining
20 your broker license?
21     A. I had to take a, I think, two more courses and
22 pass the broker's exam. I had enough courses up until
23 then. That's all I was required.
24     Q. So what do you mean by "courses"?
25     A. Two more courses, two more mandatory courses

Page 38

1  appeared there; is that correct?
2      A. Yes.
3      Q. And -- and then your name would have appeared
4  in the -- in the white middle portion --
5      A. Yes.
6      Q. -- in place of John D. Sullivan?
7      A. Yes.
8      Q. Okay. When did you -- when did you first meet
9  Mr. Abraham?
10     A. Probably, approximately, the mid '90s, '92 or
11 '93, maybe '94.
12     Q. And do you recall the circumstances in which
13 you met him?
14     A. I got a call to show a property for his sister
15 and he was with her.
16     Q. Okay. And is it accurate to say that after
17 you met him, you developed a friendship with him?
18     A. Yes.
19     Q. Okay. Just if you could, for the record and
20 for the jury, describe just generally how you became
21 friends after that.
22     A. After helping that -- him on that purchase, I
23 helped one of his other sisters on a purchase and listed
24 a couple of foreclosures that he had purchased, off and
25 on over the years, here and there.

Page 39

1      Q. Okay. So he started using you as a -- as a
2  seller's representative on some of the real estate
3  transactions that he was involved in?
4      A. A few here and there. Uh-huh.
5      Q. Do you recall -- you mentioned '92, '93 and
6  '94. Do you recall which real estate brokerage firm you
7  were with when you met him?
8      A. I'm thinking Keller Williams, so it probably
9  was '94. Wasn't Keller Williams '94?
10     Q. Yeah, '95, '96.
11     A. Okay.
12     Q. '97?
13     A. It would have been -- it would have been right
14 at the end of '94, maybe going into it.
15     Q. Okay.
16     A. But I think I was at Keller Williams.
17     Q. You were with Keller Williams at that point?
18     A. Uh-huh.
19     Q. Okay. And so do you recall -- do you have any
20 knowledge about Mr. Abraham's business called Realty,
21 Etc.?
22     A. No.
23     Q. Didn't have any -- don't have any knowledge of
24 that?
25     A. I had no connection to that.

Page 40

1      Q. Okay.
2      A. No knowledge. I really didn't know about it
3  until after it was long closed down.
4      Q. Okay. So you don't -- you haven't -- you
5  weren't involved in any properties that Realty, Etc. was
6  involved in --
7      A. Huh-uh.
8      Q. -- or trying to sell or --
9      A. No.
10     Q. -- purchase or anything along those lines?
11     A. No, sir.
12     Q. Okay. Did you at any time, up to the time
13 period in which, let's say, February of 2005 when you
14 joined Trend Setter, did you -- were you involved with
15 Mr. Abraham in any -- in connection with any real estate
16 transactions, that you can recall?
17     A. I'm confused.
18     Q. Okay.
19     A. I don't understand the question.
20     Q. Yeah. And I think I understand the confusion.
21 Let's break it down. In terms of -- after you met in
22 '94/'95, you talked about -- you called to show -- you
23 know, they called you to show property to his sister,
24 then you did some other transactions involving the
25 family, and then it sounds like you did some

Page 41

1  transactions involving Mr. Abraham. I'm talking
2  specifically now about the transactions involving
3  Mr. Abraham. Do you recall any of those transactions
4  more specifically? I mean, were there like two of them?
5  Five of them? Ten of them?
6      A. I can't recall the exact number.
7      Q. Okay. What -- what's your best recollection?
8      A. Are you talking about listings --
9      Q. Yes.
10     A. -- just listings?
11        I think we've had a few -- we had a few -- he
12 had a few foreclosures that I listed in '99, 2000, I
13 guess, it was. Maybe it was 2000.
14     Q. About 2000?
15     A. In the year 2000.
16     Q. Okay. Okay. So in the year 2000 you had --
17     A. Four or five foreclosures that he had picked
18 up that, I think, all in the same neighborhood.
19     Q. And you were the listing agent for those?
20     A. That's correct.
21     Q. So would you have been at RE/MAX Fine
22 Properties at that point?
23     A. Yes, I would have.
24     Q. So you would have used the -- your sign --
25 your RE/MAX sign, the RE/MAX sign with your name on it

Page 42

1  in front of these properties --
2     A.  Yes.
3     Q.  -- that you were selling on Mr. Abraham's
4  benefit?  Is that a "Yes"?
5     A.  Yes.
6     Q.  What about after these four or five in 2000,
7  any other ones up until February of 2005?
8     A.  I don't -- I don't recall.  I don't think so.
9     Q.  Now, do you recall talking to -- or having any
10 communications with Mr. Abraham's -- with regard to the
11 Trend Setter -- starting the Trend Setter business?
12    A.  Well, that's a bold question.  Now, how do
13 you -- where do you -- at what point, I mean, are you
14 talking about?
15    Q.  Let's just start -- we can start with the
16 first conversation that you recall.  I'm just asking if
17 you recall those conversations or communications.
18    A.  At some point, he's telling me he wants to
19 open up an office and he's thinking about starting one.
20 In fact, I think he was visiting with my husband at the
21 time and trying to come up with a name and then -- they
22 talked, the next thing I know, he said, "Would you be
23 interested in being the broker?"  That was a few months
24 before.
25    Q.  So end of 2004, early 2005 --

Page 43

1     A.  Uh-huh.
2     Q.  -- somewhere in that time frame?
3     A.  Uh-huh.
4     Q.  And so you've mentioned that your husband
5  talked to -- about the concept.  What -- what is your
6  understanding of his involvement in that?
7     A.  Oh, I think they were talking and Abraham said
8  something like, you know, "If I started" -- "I start" --
9  something like this.  He said, "I really want to do
10 something" -- "a different trend, a totally different
11 trend."
12       And my husband says, "Well, why don't you just
13 call it Trend Setters, setting a new trend in real
14 estate?"  And we went from there.
15    Q.  Okay.
16    A.  We blame him.
17    Q.  Is your husband involved in the real estate
18 business?
19    A.  No.  He is a retired Ford dealer.
20    Q.  Okay.  Okay.  So there came a time when he --
21 Mr. Abraham asked you to join as the broker of record
22 for Trend Setter?
23    A.  Yes.
24    Q.  Okay.  When did that happen?  Do you recall
25 when that -- about the time that had happened?

Page 44

1     A.  I would say, probably, a month or two before,
2  beforehand.
3     Q.  Before what?
4     A.  Before we started it, a couple months
5  beforehand.
6     Q.  Okay.
7     A.  He said, "Would you be interested in doing
8  that?"
9     Q.  Okay.  So now he -- he testified that the
10 Trend Setter opened its doors around April 1st, 2005.
11 Is that your recollection?
12    A.  No.  I think it was March.
13    Q.  March of '05?
14    A.  (Witness nods head.)
15    Q.  So when you say two to three months in
16 advance, you're probably looking at January '05,
17 December '04?
18    A.  January '05.
19    Q.  January '05?
20       Obviously, the reason you left RE/MAX Elite
21 was to take this position; correct?
22    A.  Correct.
23    Q.  Okay.  So -- but were you looking to leave
24 RE/MAX Elite prior to having Mr. Abraham suggest this
25 business or were you -- were you satisfied there or --

Page 45

1     A.  You know, I just -- you never know when a door
2  opens.  So I can't tell you whether I would have left
3  there at that point and gone and taken my license home
4  because I had my broker's license or what I would have
5  done.
6     Q.  Right.
7        Was Jim Keenan the broker of record when you
8  left?  Do you remember?
9     A.  I don't think so.
10    Q.  Do you recall who the broker of record was?
11    A.  K.C. Lamb.
12    Q.  Okay.  Now, you mentioned -- I think your
13 words were about Realty, Etc. that you didn't -- you
14 said it was "long closed down."  What's your
15 understanding of -- of the status of Realty, Etc. at
16 this point?
17    A.  My understanding is that it was opened a year
18 or so because if it was still in operation, he would not
19 have called me at the end of '99, first of 2000, to list
20 his foreclosure properties.  I didn't even know he had
21 it going.  We'd gone a time where we didn't talk, you
22 know, different directions and whatever.
23    Q.  Right.
24    A.  And so I didn't even -- I wasn't aware of
25 Realty, Etc. existing.

### Page 90

1  that -- am I looking at it? Do you --
2      A. I don't know how you're -- I'm not sure I'm
3  understanding your question.
4      Q. Right. So -- well, I'm trying to get at this,
5  if you have 150 transactions that that's involving, even
6  if you assume that each transactions is by one sale --
7  an individual sales associate, only 150 agents are
8  involved out of 700 or so in a transaction in a
9  particular month; right?
10     A. If that's -- if that's a figure he gave you
11 because I'm not sure on the count.
12     Q. You're not sure on the count?
13     A. Huh-uh. I'm -- well, again, I'm not counting
14 the stuff I'm looking at. I'm just going through them
15 and making sure their paperwork's there.
16     Q. Right.
17     A. And passing it back for processing.
18     Q. Right. So let's, I mean, you've -- you said
19 you took two weeks off this month. Good for you.
20 And -- but let's say in the last six weeks, in terms of
21 the paperwork that you've reviewed, have there been any
22 names that you can recall that have come up, let's say,
23 more than once or --
24     A. I couldn't tell you.
25     Q. -- in terms of Trend Setter --

### Page 91

1      A. I look through too many. I couldn't tell you.
2      Q. You -- there's not one that you've said, "Oh,
3  I've seen this name before and" -- or "This is the
4  fourth transaction in the last six weeks" or --
5      A. No. I -- I -- I couldn't tell you when an
6  agent did something and whether they had done it twice
7  or not or three times or four times. I'm just looking
8  at the contracts.
9      Q. Okay. The -- have you seen the -- the Ad-Mar
10 documents with -- with Realty, Etc. regarding the -- the
11 sign back from 1999?
12     A. No.
13     Q. Okay. Do you have an understanding, based on
14 your having been involved with --
15     A. In fact, I didn't even know he was doing it
16 back in '99.
17     Q. Okay. I was just --
18     A. I thought it was earlier than that, so I'm
19 just -- just for the record.
20     Q. Sure. Okay. So do you have an understanding
21 of not -- of whether or not an R/M is an abbreviation
22 for RE/MAX?
23     A. I haven't seen anything on -- Realty, Etc.,
24 you're talking about; right?
25     Q. Right.

### Page 92

1      A. I haven't seen anything on that because I
2  wasn't involved in that.
3      Q. No. I understand, but based on your
4  experience having been involved with three RE/MAX
5  brokerages, is R/M an abbreviation for RE/MAX?
6      A. It could stand for -- it could stand for other
7  things, too. I can't -- you know, I don't -- it depends
8  on the context.
9      Q. Right. So if it's like R/M red and blue?
10     A. Again, I wasn't involved so I don't know what
11 you're referring to so, you know.
12     Q. I mean, what --
13     A. I don't want to make a commitment to something
14 I'm not privileged to or aware of.
15     Q. Right. In connection with your involvement
16 with the RE/MAX affiliates that you were involved in,
17 did you ever use the abbreviation R/M?
18     A. I've seen RM. I've seen R/M. I never used
19 R/M. It's not a term I used. I was under the
20 impression that it had to be spelled out.
21     Q. But you've seen the abbreviation R/M before in
22 connection with your work with RE/MAX?
23     A. I'm sure I may have. I don't -- I can't
24 commit to that because I can't tell you. I mean, I just
25 can't commit to it.

### Page 93

1      Q. Did you have any involvement with the -- the
2  Trend Setter website?
3      A. Some.
4      Q. Okay. What was your involvement?
5      A. Some of the copy. Some of the copy on the --
6  I wrote the -- what we expect and the philosophy, that
7  kind of stuff. Boy, that was a long time ago, too.
8      Q. I'm going to hand you what's been marked as
9  Abraham 13. Is that something that you would have --
10 that you were involved in?
11     A. Yes.
12     Q. Why did you draft that?
13     A. Why did I draft that?
14     Q. Uh-huh.
15     A. Just to have something to present --
16 originally, to present to the agents about when they
17 came in to sign up, so we'd have something to work with
18 and he decided to put it on his website.
19     Q. Okay. Were you involved in any other portion
20 of the website?
21     A. Not a whole lot, just my opinion on things
22 every now and then.
23     Q. Okay. Anything specific that you can
24 remember?
25     A. Not really.

Page 98

1    A.  I don't have any input on that. That
2    pre-existed. He had that before me. He decided to use
3    it. I am just the broker of record. I'm not involved
4    in that. I didn't get involved in the design or -- I
5    just stepped in as broker of record.
6    Q.  Okay. Now, there's an independent contractor
7    agreement that you signed while you were at Elite,
8    RE/MAX Elite; correct?
9    A.  Yes.
10   Q.  We marked that as -- I'm going to hand you
11   what's been marked as Abraham 19. Is this your
12   independent contractor agreement with RE/MAX Elite?
13   A.  Well, I will say that that's my signature on
14   the last page, but -- I'm thinking that is, but I --
15   it's a copy. It's not the original, so I don't know.
16   I'm assuming it is.
17   Q.  Okay. So that's your signature on the -- I
18   guess we can go off the top. That's page -- that says
19   Page 10 on the upper right side on the fax page?
20   A.  Uh-huh.
21   Q.  And then I think underneath, it has a dash 9
22   dash?
23   A.  Right.
24   Q.  Do you see that?
25   A.  Uh-huh.

Page 99

1    Q.  That's your signature there?
2    A.  Yes.
3    Q.  And then on the previous page, is that your
4    signature there as well?
5    A.  Yes, it is.
6    Q.  Do you recall signing it?
7    A.  Yes, I do.
8    Q.  Okay. And do you recall -- in the individual
9    guaranty portion down below, is that your signature as
10   well?
11   A.  Yes, it is.
12   Q.  Now, I think you testified a little bit
13   earlier that you did -- you were not provided a copy of
14   this agreement; is that correct?
15   A.  No. I've really never seen a copy of this
16   thing before, other than when I signed it.
17   Q.  Right. So you signed it. Did you -- was
18   there a copy not purposely given to you? It was just
19   a -- a situation where you didn't request it and they
20   didn't provide you a copy?
21   A.  Basically.
22   Q.  Okay. Now, have you had an opportunity to
23   review the agreement recently?
24   A.  I really haven't looked it over that much.
25   Q.  Is it your understanding that this agreement

Page 100

1    prevents you from using the RE/MAX trademarks?
2    A.  I don't use the RE/MAX trademarks.
3    Q.  Pardon?
4    A.  I don't use the RE/MAX trademarks.
5    Q.  That's not my question. My question is, does
6    the agreement -- is it your understanding that the
7    agreement says that you cannot use the RE/MAX
8    trademarks?
9    A.  Yes.
10   Q.  All right. I want to go to a specific
11   provision in the contract. And I believe it is -- I
12   want to direct your attention to Paragraph 12-B.
13   A.  Okay.
14   Q.  And there's a -- a sentence that is -- starts
15   on the one, two, three, four, fifth, sixth line down, it
16   starts out, "Contractor."
17   A.  Okay.
18   Q.  Okay? And so do you understand that you --
19   that you are the contractor? You're considered the
20   contractor as --
21   A.  Okay.
22   Q.  Is that your understanding?
23   A.  Okay. Yes.
24   Q.  All right. So it says, "Contractor
25   acknowledges our Regional's and International's

Page 101

1    exclusive right to use its real estate systems, its
2    method of operation and its distinguishing
3    characteristics, including but not limited to service
4    marks, trademarks, trade names, copyrights,
5    certification marks, designs, slogans, logos, telephone
6    numbers, business cards, lawn signs, color combinations
7    and style names or other advertising copy now or
8    hereafter displayed, used or becoming part of the RE/MAX
9    business." Do you see that?
10   A.  Uh-huh.
11   Q.  Okay. So would you agree with me that the --
12   that the orientation of red, white and blue as it's
13   shown on the RE/MAX sign is a color style?
14   A.  No.
15   Q.  It's not a color combination?
16   A.  It may be a color combination, but I don't
17   know where it says red, white and blue here.
18   Q.  But it says color combination; does it not?
19   A.  Well, so is the United States flag, red, white
20   and blue.
21   Q.  Does the United States flag have three bars?
22   A.  You just said color combination. You did not
23   say shapes.
24   Q.  I'm asking you a question. Does the American
25   flag have three bars?