# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| RE/MAX International, Inc., | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 4:07-CV-02426 |
| TREND SETTER REALTY, LLC, a Texas limited liability company; | ) |
| PAVNOUTY ABRAHAM, an individual; | ) |
| and | ) |
| DEBORAH N. MILLER, an individual | ) |
| Defendants. | ) |

## DECLARATION OF ROBERT A. PETERSON IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, ROBERT A. PETERSON, declare as follows:

1. I am a professor of marketing at The University of Texas at Austin. I submit this Declaration in support of the Motion for Partial Summary Judgment by RE/MAX International, Inc., the plaintiff in the above-captioned action. I have personal knowledge of the facts recited below, and if called upon to testify concerning these facts under oath, I could and would do so competently.

2. At The University of Texas at Austin, I hold two endowed positions, the John T. Stuart III Centennial Chair and the Charles C. Hurwitz Fellowship. I am also

Associate Vice President for Research at The University of Texas at Austin. Over the course of more than three decades I have taught various undergraduate, MBA, and doctoral marketing courses at The University of Texas at Austin. These courses include graduate and undergraduate courses in marketing research, statistics, consumer behavior, and marketing strategy.

3. A copy of my resume is attached as Exhibit 1 to this Declaration. As the resume indicates, I have published more than 150 books and peer-reviewed articles relating to marketing strategy and management, consumer behavior, and marketing research. Among my books are Marketing Research, a college textbook, and Constructing Effective Questionnaires, a sourcebook for researchers. Among my articles are many dealing with research methodology and brand names (e.g., "How to Name New Brands" and "Trademark Dilution and the Practice of Marketing"). I have received several awards for my research, including the Jagdish N. Sheth Award, the John D. C. Little Award, and the McCombs School of Business Career Award for Outstanding Research Contributions.

4. I have served as chairman of the Marketing Department at The University of Texas at Austin and as Associate Dean for Research in the McCombs School of Business at The University of Texas at Austin. I have served as editor-in-chief of two major academic marketing journals, the *Journal of Marketing Research* and the *Journal of the Academy of Marketing Science*. I have also served as an officer in various professional academic associations, including service as president of the Academy of Marketing Science, and as a member of an advisory committee to the United States Census Bureau.

5. Over the past quarter century I have served as a consulting or testifying expert witness in dozens of litigation matters, including those involving intellectual property and unfair competition matters. A listing of litigation matters in which I have provided trial or deposition testimony since 2003 is attached hereto as Exhibit 2.

6. At the request of RE/MAX, I personally designed and commissioned an empirical survey to determine whether the red-over-white-over-blue Trend Setter Realty yard sign is likely to be confused with RE/MAX. The methodology and the results of the survey are detailed below. For the Court's convenience, my full report on the survey is attached hereto as Exhibit 3.

7. The likelihood of confusion investigation consisted of personal interviews with individuals in three geographically dispersed shopping malls in the Greater Houston, Texas metropolitan area. The targeted universe consisted of individuals who were 18 years of age or older in the Greater Houston metropolitan area and who:

- were involved in buying or selling a home through a real estate agent or broker in the 12 months preceding the survey; or
- had considered buying or selling a home through a real estate agent or broker in the 12 months preceding the survey, or
- were considering buying or selling a home through a real estate agent or broker in the 6 months subsequent to the survey.

8. The targeted universe excluded individuals who (i) worked for an advertising agency, marketing research firm, or store in the mall where the interviewing took place; (ii) had a household or family member who worked for an advertising agency, marketing research firm, or store in the mall where the interviewing took place; (iii) worked for a real estate company, homebuilder, remodeler, or home inspector; and

(iv) who had someone in their household or family who worked for a real estate company, homebuilder, remodeler, or home inspector.

9. Two independent samples were employed in the investigation. One sample of 150 survey participants was shown a picture containing the red-over-white-over-blue Trend Setter Realty yard sign. The color photo shown to this group, the likelihood of confusion assessment group, is attached as Exhibit 4 to this Declaration.

10. A second sample of 75 survey participants, the control sample, was shown a picture of the Trend Setter Realty yard sign modified by removing the red and blue horizontal bars while retaining the roof-sloped boundary of the upper red bar as a blue line. Except as noted, all text and symbols were preserved in the same location as on the actual Trend Setter Realty yard sign. The color photo shown to this group is attached as Exhibit 5 to this Declaration. This modified sign was used to assess possible survey participant guessing and noise in the survey data when the picture containing the red-over-white-over-blue Trend Setter Realty yard sign was the stimulus.

11. Data were collected in shopping malls in south-central Houston, Sugarland, and The Woodlands. Data collection took place from November 14 through November 23, 2008. All data were collected by professional field services in the respective malls. Attachment 3 to my expert report contains the instructions given to the field services. Neither the field services nor the interviewers were aware of the purpose or the sponsor of the survey. Consequently, the survey participants were also unaware of either the purpose or the sponsor of the survey.

12. The field services followed standard, accepted operating procedures when interviewing survey participants. Completed questionnaires were spot-edited by the field services. Approximately 15 percent of the completed interviews were validated through follow-up telephone calls by an independent survey research company, AustinTrends.

13. The questionnaire employed in the investigation is contained in Attachment 4 to my expert report (attached as Exhibit 3 to this Declaration). In the first part of the questionnaire, potential survey participants were screened so that only individuals who were part of the targeted universe were eligible for sample inclusion.

14. Individuals qualifying on the screening criteria were shown either a picture containing the actual or the modified Trend Setter Realty yard sign. The picture was removed from an envelope and survey participants viewed it as long as they wanted to do so. The picture was then returned to the envelope.

15. The interviewer then asked the following open-end questions:

"From what you know, what company is being promoted or advertised by this sign?"

"Why do you say that?"

"What other reasons?"

"From what you know, is the company being promoted or advertised by this sign affiliated or connected with any person, firm, or organization?

[If so] "Which one(s)?"

"Why do you say that?"

"What other reasons?"

"From what you know, would you expect that the company being promoted or advertised by this sign would have to get permission or approval from any person, firm, or organization to use the sign?"

[If so] "Which one(s)?"

"Why do you say that?"

"What other reasons?"

16. The same questionnaire was used for the likelihood of confusion assessment sample and the control sample. After a survey participant answered the questions, the interviewer asked the survey participant his or her name, thanked the survey participant, and gave the survey participant $3.00.

17. The methodology employed in the survey consisted of standard, accepted research procedures, methods, and techniques, including judicially-accepted *Everyready* design. Consequently, subject to the research design parameters, survey results should be considered valid, reliable, and generalizable to the targeted universe.

18. When shown the picture containing the Trend Setter Realty yard sign and asked the question, "From what you know, what company is being promoted or advertised by this sign?", 16.7 percent of the survey participants responded "RE/MAX." When asked, "From what you know, is the company being promoted or advertised by this sign affiliated or connected with any person, firm, or organization?", an additional (independent) 7.3 percent of the survey participants responded "RE/MAX." When asked the question, "From what you know, would you expect that the company being promoted or advertised by this sign would have to get permission or approval from any person, firm, or organization to use the sign?", two survey participants (1.3 percent of the sample) stated that the company would have to get permission from RE/MAX.

19. The possible effects of uncontrollable survey factors such as survey participant guessing and survey data noise on the assessment of likelihood of confusion

when a picture containing the red-over-white-over-blue Trend Setter Realty yard sign was shown to survey participants were assessed by means of an independent sample. In addition to the sample of survey participants shown the red-over-white-over-blue Trend Setter Realty yard sign picture, a second sample of survey participants was shown a picture the Trend Setter Realty sign modified to be white with a stylized blue roof line. In research terms, the modified yard sign is a "control" for the Trend Setter Realty yard sign and the sample shown this sign is a control sample.

20. Of the 75 survey participants in the control sample, two, approximately 2.7 percent, mentioned RE/MAX in response to the first question ("the company being promoted or advertised by the sign"). Since the red-over-white-over-blue color yard sign was not in the modified picture, any mention of RE/MAX by survey participants shown the modified yard sign had to be due to survey participant guessing or survey noise factors. By comparing survey participant responses to the respective yard signs, it was possible to assess consumer confusion as a result of the red-over-white-over-blue color scheme of the Trend Setter Realty yard sign being perceived as associated with RE/MAX. As such, the comparison served as the basis of inferences regarding likelihood of confusion due to the red-over-white-over-blue color scheme used by Trend Setter Realty on its yard signs.

21. A statistical analysis was undertaken to guide inferences in the investigation. Using a confidence coefficient of .99, the collective likelihood of confusion percentage response of 25.3 percent to the "promoted/advertised," "affiliated/connected," and "permission/approval" questions for the red-over-white-over-blue Trend Setter Realty yard sign was evaluated. If the survey were replicated 100 times, the

percentage of the targeted universe responding "RE/MAX" to the questions when shown the picture containing the red-over-white-over-blue Trend Setter Realty yard sign would fall in the approximate interval 16.1 percent to 34.5 percent 99 times, with the expected percentage being approximately 25.3 percent. Thus, approximately 25.3 percent of the targeted universe was likely to be confused when exposed to the red-over-white-over-blue Trend Setter Realty yard sign.

22. Applying the .99 confidence coefficient to the control percentage of 2.7 percent indicates that the 2.7 percent figure is not significantly different from zero. Thus it reflects random sampling error. Consequently, even taking into account survey participant guessing and survey data noise, the 25.3 percent likelihood of confusion percentage is both statistically and substantively meaningful.

23. The conclusions to be drawn from the investigation described above are as follows: When shown a photo containing the red-over-white-over-blue Trend Setter Realty yard sign, approximately 25.3 percent of the survey participants, individuals in the targeted universe, stated that RE/MAX is being promoted or advertised by the sign, that the company being promoted by the sign is affiliated or connected with RE/MAX, or that the company being promoted or advertised by the sign had to obtain permission or approval from RE/MAX to use the sign. This percentage is significantly different from zero, and takes into account guessing by survey participants and noise in the survey data. Consequently, there is a significant likelihood that individuals in the targeted universe are likely to be confused when seeing the red-over-white-over-blue Trend Setter Realty yard sign.

I declare under penalty of perjury under the laws of the United States and the State of Texas that the foregoing is true and correct.

Executed on February 18, 2009

By: _____
Robert A. Peterson