# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| RE/MAX INTERNATIONAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-2426 |
| | § | |
| TRENDSETTER REALTY, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

RE/MAX International, Inc., brought this trademark infringement suit against Trend Setter Realty, LLC, one of its competitors in the real estate brokerage industry. RE/MAX also sued Pavnouty Abraham, Trend Setter's registered agent, director, and president, and Deborah Miller, a former RE/MAX real estate agent who is now Trend Setter's broker of record. RE/MAX has moved for partial summary judgment on its federal and state trademark infringement and unfair competition claims against all the defendants and on its breach of contract claim against Miller. (Docket Entry Nos. 44, 45). RE/MAX also seeks cancellation of Trend Setter's registered trademark on the ground that it causes confusion with RE/MAX's registered trademarks. Finally, RE/MAX moves for summary judgment dismissing the defendants' counterclaim for cancellation of RE/MAX's registered mark. (*Id.*).

The defendants have filed a response. (Docket Entry No. 55). Because the defendants missed the deadline to respond, they have also filed a motion for extension. (Docket Entry No. 50). Finally, they have filed a motion for leave to amend their original answer to RE/MAX's complaint. (Docket Entry No. 51). RE/MAX opposes both motions. (Docket Entry Nos. 58, 59).

After careful review of the motions, responses, and replies; the record; and the relevant law, this court: (1) grants defendants' motion to extend the deadline to file their response to RE/MAX's summary judgment motion; (2) denies the defendants' motion for leave to amend their complaint; (3) grants RE/MAX's motion for partial summary judgment and RE/MAX's claim for cancellation of the mark registered as No. 3,222,708; and (4) denies the defendants' claim for cancellation of the mark registered as No. 1,702,048.

No later than **September 18, 2009**, the parties must advise the court of any remaining issues and propose a timetable for resolving them or submit a proposed final judgment.

The reasons for these rulings are explained below.

I.    **Background**

A.    **Factual Background[1]**

RE/MAX is a corporation that has provided real estate brokerage services through a network of franchisees and affiliated independent contractors and sales associates since the early 1970s. (Docket Entry No. 46 at ¶ 6,7).  Trend Setter is a limited liability company with offices in Houston and San Antonio.  It has provided real estate brokerage services in the Houston area since around April 1, 2005.  (Docket Entry No. 45-11 at 12, 13).  Defendant Pavnouty Abraham founded Trend Setter in early 2005 and remains its sole owner.  (Docket Entry Nos. 45-10 at 44, 45-11 at 12, 13). Abraham  is responsible for marketing and promoting Trend Setter's services to those interested in

---

[1] The summary judgment record includes RE/MAX's federal trademark registrations (Docket Entry No. 45, Ex. A); RE/MAX's Texas registration (*id.*, Ex. B); Trend Setter's federal trademark registration (*id.*, Ex. E);. Miller's deposition (*id.*, Ex. I); Abraham's deposition (*id.*, Ex. J, Docket Entry No. 55, Ex. 4); a November 30, 1998 invoice from Ad-Mar Signs for Abraham's purchase of ten "Realty, Etc." yard signs (Docket Entry No. 45-11, Ex. 3); a survey conducted by Robert Peterson, including Peterson's report (Docket Entry No. 47); the survey results and participant responses (Docket Entry No. 47-4); the RE/MAX Trademark and Graphics Standards (2005) (Docket Entry No. 55-2); and Miller's Independent Contractor Agreement with RE/MAX Elite ("ICA") (Docket Entry No. 45, Ex. D).
.

buying or selling real estate.  (Docket Entry No. 45-8, at 8-9).  Defendant Deborah Miller is currently the broker of record, or sponsoring broker, for Trend Setter.  (Docket Entry No. 45-10 at 9, 42-44).  She joined Trend Setter after working as a real estate agent with several firms, including two separate RE/MAX franchises.  (*Id.* at 14-21).

RE/MAX holds several federal trademark registrations for service marks.  (Docket Entry No. 45, Ex. A).  All the marks feature a rectangular design consisting of three equally spaced horizontal bars.  The top bar is red, the middle bar is white, and the bottom bar is blue.  Some of RE/MAX's marks also contain other words and/or design elements, the most well-known of which is the red, white, and blue RE/MAX hot-air balloon.  (*Id.*).  This suit involves three federal marks, U.S. Trademark Registration No. 1,691,854 (registered on June 9, 1992), No.1,702,048 (registered on July 21, 1992), and No. 1,720,592  (registered on Sep. 29, 1992), and one state mark, Texas State Trademark Registration No. 55729 (registered on June 5, 1996).  (*Id.*, Exs. A, B).  RE/MAX's Registration No. 1,691,854 and No. 1,720,592 have the three horizontal red, white, and blue bars in the rectangular design and a slanted red, white, and blue hot-air balloon in the top left corner. (*Id.*, Ex. A).  The trademark application claims that these marks were first used in commerce in October 1979.  (*Id.*)  RE/MAX's federal Trademark Registration No. 1,702,048 has the three red-over-white-over-blue horizontal bars without a balloon.  (*Id.*)  This mark was first used in commerce on January 1, 1974. (*Id.*)  RE/MAX's Texas Registration No. 55729 also has the red-over-white-over-blue horizontal bars without a balloon.  (Docket Entry No. 45, Exhibit B).  RE/MAX's service marks are registered for use in conjunction with providing real estate brokerage and insurance brokerage services.  (*Id.,* Exs. A, B).

Since as early as 1974, RE/MAX and its affiliates have provided real estate brokerage services in the United States using the RE/MAX service marks. (Docket Entry No. 46 at ¶ 7). RE/MAX brokers and associates use these marks on a variety of advertising media—including yard signs, business cards, newspapers and other print media, Internet web sites, hot-air balloons, brochures, banners, and other advertising items—to identify themselves as associated with the RE/MAX franchise. (*Id.* at ¶ 8). RE/MAX has invested billions of dollars developing and maintaining its marks in the United States and worldwide. (*Id.* at ¶ 9).[2] RE/MAX affiliates have used "the RE/MAX Trademark" in connection with over 20 million real estates transactions around the world. (*Id.* at ¶ 10). RE/MAX has continuously operated using its trademark in the Houston area since 1979 and in the San Antonio area since 1984. (*Id.* at ¶ 12).

Trend Setter is the owner of U.S. Trademark Registration No. 3,222,708, filed May 30, 2006 and issued on March 27, 2007. (Docket Entry No. 45-6). This trademark consists of a rectangular design with three parts. The top is red, the middle is white, and the bottom is blue. The middle white portion is in the shape of a stylized representation of a house. The top red portion would be a horizontal bar but for the protrusion of the white roof. The bottom blue portion is a straight horizontal bar. (*Id.*). The Trend Setter mark is registered for use in conjunction with real estate brokerage services. (*Id.*). Trend Setter's registration application stated that the first use was in December 1996 and the first use in commerce was in October 19, 1998. (*Id.*).

---

[2] RE/MAX has brought other suits to defend its trademarked red, white, and blue design. *See, e.g., RE/MAX International, Inc. v. Citimaxx Corp.*, 2009 WL 1883035 (M.D.Fla. June 30, 2009) (denying defendant's motion to dismiss and staying case pending arbitration); *RE/Max International, Inc. v. Equity Max Realty, Inc.*, 2007 WL 1110590 (S.D.Cal. Apr. 3, 2007) (denying defendant's motion for judgment on the pleadings); *District RE/MAX North Central, Inc. v. Cook*, 64 Fed. Appx. 562 (7th Cir. 2003) (upholding summary judgment for RE/MAX against former franchisee on Lanham Act claim); *RE/MAX International, Inc. v. Quality Realty, Inc.*, 1999 WL 33257265, *2 (N.D. Ill. Feb. 19, 1999) (recommending contempt sanctions after entering judgment for RE/MAX on its trademark and unfair competition claims).

4

Pavnouty Abraham testified in his deposition that he first used the Trend Setter trademark as early as 1998, when he ordered ten red, white, and blue yard signs for his previous realty business, Realty, Etc. (Docket Entry No. 45-11 at 126-129, Ex. 3). In March 2005, Abraham started a new real estate brokerage service, Trend Setter Realty, which opened its Houston location on April 1, 2005. (Docket Entry No. 45-11 at 12-13). Abraham hired Deborah Miller as Trend Setter's broker of record. (*Id.* at 109, 110). By the end of 2005, Trend Setter had between 150 and 200 agents. (Docket Entry 45-11 at 241). By mid-2008, Trend Setter had approximately 700 agents. (*Id.*).

Since it opened in April 2005, Trend Setter agents have used the red, white, and blue mark with the stylized house shape in the center to identify the real estate agency to current and potential clients. Trend Setter has used the mark in various advertising media, including real estate yard signs, brochures, fliers, home listings, and newspaper advertisements, as well as on its website, http://www.trendsetterrealty.com. (Docket Entry No. 45-8 at 8). The Trend Setter yard signs contain the red, white, and blue Trend Setter design with the words "For Sale" on the red top portion, the listing agent's name and phone number on the bottom blue bar, and the name "Trend Setter" in bold across the white portion. (Docket Entry No. 55 at 5).

Abraham met Miller in the mid-1990s. (Docket Entry No. 45-10 at 38). During the 1990s, Miller worked as a sales associate at various real estate firms, including two RE/MAX franchises, in the Houston area. (*Id.* at 15-21). As a RE/MAX sales affiliate, Miller used RE/MAX service marks on RE/MAX yard signs with her name on them when she listed homes for sale. (Docket Entry No. 45-10 at 15-21, 41-42). Around 2000, while Miller was still a RE/MAX agent, she listed four or five houses on Abraham's behalf using her RE/MAX yard sign. (Docket Entry No. 45-10

at 41-42).  When Abraham began Trend Setter, he employed Miller as his broker of record.  Miller,

testified that she left RE/MAX on about February 28, 2005 to become the "jack of all trades" at

Trend Setter.  (Docket Entry No. 45-10 at 9).

When she worked at RE/MAX Elite, a RE/MAX franchise, Miller entered into an

Independent Contractor Agreement ("ICA") that allowed her to use RE/MAX's service marks

during her employment but stipulated that after her employment ended, she would stop using any

of RE/MAX's "distinguishing characteristics," including RE/MAX's service marks, trademarks,

designs, slogans, logos, lawn signs, "color combinations and style," and "other advertising copy now

or hereafter displayed, used or becoming a part of the RE/MAX business." (Docket Entry No. 45,

Ex. D).  When Miller left RE/MAX in February 2005, her contractual obligations to cease using the

RE/MAX marks began.  RE/MAX Elite has assigned its rights in the ICA to RE/MAX, including

the right to bring suit to enforce the ICA.  (Docket Entry Nos. 45-9, 46 at ¶ 15).

According to RE/MAX, soon after Miller's departure from RE/MAX Elite, RE/MAX

became aware that Miller was offering competing real estate brokerage services in the Houston area

on Trend Setter's behalf, using a red-over-white-over-blue yard sign.  (Docket Entry No. 20 at 7).

On April 18, 2006, RE/MAX wrote Miller a cease-and-desist letter, which Abraham also read,

stating that her use of a "confusingly similar" yard sign in conjunction with offering real estate

services was likely to cause consumer confusion with RE/MAX's trademarks.  (Docket No. 45-11

at 216-17).  Soon after, Abraham retained counsel.  (*Id*. at 217).  RE/MAX subsequently wrote

several letters to Trend Setter informing it of the allegedly infringing activity.  (Docket Entry No.

45 at 11).  On May 30, 2006, Trend Setter filed its application for Trademark Registration No.

3,222,708.  (*Id.*).  On July 25, 2007, RE/MAX filed this suit against Trend Setter, Abraham and

6

Miller, alleging that they were using Trend Setter signs and other advertising materials that have a design and color arrangement confusingly similar to the RE/MAX marks. RE/MAX also alleges that Trend Setter had obtained a confusingly similar federal service mark despite knowing about the RE/MAX's marks. (Docket Entry No. 1).

### B.    Procedural History

In its July 25, 2007 complaint, RE/MAX asserted claims for trademark infringement, trademark dilution, and unfair competition under federal law (Docket Entry No. 1, Counts I, II and III); trademark infringement and dilution under the Texas Business and Commerce Code § 16.26 and § 16.29 (Counts IV and V); and trademark infringement and unfair competition under Texas common law (Counts VII and VIII). RE/MAX also asserted a Texas common-law breach of contract claim against Miller for violating the ICA. (Count VIII). When it amended its complaint on September 24, 2007, RE/MAX added a claim for cancellation of Trend Setter's trademark Registration No. 3,222,708 on the ground that it causes confusion with RE/MAX's registered marks. (Docket Entry No. 14, Count IX).

The defendants answered and counterclaimed. (Docket Entry No. 11). The counterclaims seek a declaratory judgment of noninfringement and of nondilution, and request cancellation of RE/MAX's federal trademark Registration No. 1,702,048. (Docket Entry No. 11). RE/MAX answered the counterclaims. (Docket Entry No. 15). The defendants did not answer RE/MAX's amended complaint. On March 25, 2009, however, they moved for leave to amend their answer, (Docket Entry No. 51), and filed a proposed amended answer to the amended complaint. (Docket Entry No. 52).

RE/MAX seeks summary judgment on its federal and state trademark infringement and

unfair competition claims against all the defendants and on its breach of contract claim against Miller. (Docket Entry Nos. 44, 45). In addition, RE/MAX seeks cancellation of Trend Setter's Registration No. 3,222,708. (Docket Entry Nos. 44, 45). RE/MAX does not seek summary judgment on its dilution claims, which it has asked this court to dismiss if summary judgment is granted on the trademark infringement claims. (Docket Entry No. 45 at 3 n.1). The defendants missed the March 16, 2009 deadline to respond to RE/MAX's partial summary judgment motion. Shortly after the deadline, however, on March 23, 2009, the defendants moved to extend their deadline for filing a response. (Docket Entry No. 50). On March 27, the defendants filed a response, which they ask this court to deem filed as of that date. (Docket Entry Nos. 54, 55). The response asserts that material issues of fact preclude granting the summary judgment motion and asks this court to cancel RE/MAX's Registration No. 1,702,048. (Docket Entry No. 55).

RE/MAX opposes the defendants' motion for an extension as well as the defendants' motion for leave to amend their answer. (Docket Entry Nos. 58, 59). RE/MAX also submitted a "further reply" addressing the issues raised in the defendants' summary judgment response. (Docket Entry No. 58-2). RE/MAX has asked that the "further reply" be filed if this court grants the defendants' motion for an extension of time to file their response. (Docket Entry No. 58).

## II.    The Rule 56 Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### III.    The Defendants' Motion for Extension of Time

After the deadline to respond passed, the defendants filed both a response to RE/MAX's motion for partial summary judgment and a motion for extension, asking this court accept its tardy

response. (Docket Entry Nos. 50, 54, 55). Rule 6(b)(2) of the Federal Rules of Civil Procedure provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time… (B) on motion made after the time has expired if the party failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(2). "Relevant factors to the excusable neglect inquiry include: the danger of prejudice to the non-movant, the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Adams v. Travelers Indemnity Co.*, 465 F.3d 156, 161 n.8 (5th Cir. 2006) (citing *Farina v. Mission Inv. Trust,* 615 F.2d 1068, 1076 (5th Cir.1980); *Pioneer Inv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395-97, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)) (quotation marks removed).

In *Adams*, the Fifth Circuit found that the district court did not abuse its discretion by refusing to grant a plaintiff's request for an extension under Rule 6(b)(2). The plaintiff had already been granted two extensions. 465 F.3d at 161-62. In the present case, by contrast, although the defendants have delayed in meeting other deadlines, this is their first request for extension with respect to the summary judgment motion. The defendants filed their opposition on March 27, 2009, a little over one week after the March 16 deadline. They have presented a reason for the delay: unsuccessful efforts to settle the case and a delay in hearing from RE/MAX that the settlement proposal was unacceptable. (Docket Entry No. 50 at 1-2). The record does not show that the defendants were acting in bad faith. The defendants apparently believed that a settlement was likely and did not want to "expend[] the time and expense" of responding to the motion. (*Id.*). When RE/MAX refused their settlement proposals, the defendants began drafting their response to the summary judgment motion. (Docket Entry No. 50 at 2). The delay was short and RE/MAX has

10

suffered no prejudice as a result.  On April 13, 2009, RE/MAX filed a thorough reply as an attachment to its response to the motion for extension.  (Docket Entry No. 58-2).

The defendants' motion for an extension is granted.  The defendants' response to the summary judgment motion and memorandum is deemed filed as of March 27, 2009.

## IV.    The Defendants' Motion for Leave to Amend Their Answer

The defendants have also moved for leave to amend their answer, affirmative defenses and counterclaims, (Docket Entry No. 51), and have filed a proposed first amended answer, (Docket Entry No. 52).  Rule 15 of the Federal Rules of Civil Procedure requires leave of court for a party to file an amended pleading.  Leave is freely given but is "by no means automatic." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992).  A district court may consider factors such as undue delay,  bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

On March 25, 2009, the defendants moved for leave to amend their answer under Rule 15(a). (Docket Entry No. 51).  The scheduling and docket control order set a February 8, 2008 deadline to amend the pleadings and a January 30, 2009 deadline to complete discovery.  (Docket Entry No. 59 at 2).  The Rule 16(b) "good cause" standard, rather than the "freely given" standard of Rule 15(a), governs a motion to amend filed after the deadline set in the scheduling order.  *See Parker v. Columbia Pictures Inds.,* 204 F.3d 326 (2d Cir. 2000); *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330 (3d Cir. 2000); *In re Milk Prods. Antitrust Litig*., 195 F.3d 430, 437 (8th Cir. 1999); *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam); *Johnson v. Mammoth*

*Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1518 (10th Cir. 1990).  As the Eleventh Circuit has noted, "[i]f we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *Sosa*, 133 F.3d at 1419; *see also Johnson*, 975 F.2d at 610 ("[d]isregard of the [scheduling] order would undermine the court's ability to control its docket, [and] disrupt the agreed-upon course of the litigation"); *Riofrio Anda*, 959 F.2d at 1155 (permitting amendment using Rule 15(a)'s standards after scheduling order cutoff "would have nullified the purpose of Rule 16(b)(1)").

Once a scheduling order deadline to amend a pleading has expired, the party seeking to amend is effectively asking the court for leave to amend both the scheduling order and the pleading. *See, e.g., Johnson*, 975 F.2d at 607-08; *SIL-FLO*, 917 F.2d at 1518.  If the movant satisfies the requirements of Rule 16(b), the court must then determine whether to grant leave to amend under Rule 15(a).  *See Johnson*, 975 F.2d at 608; *Tschantz v. McCann*, 160 F.R.D. 568, 571 (N.D. Ind. 1995); *American Tourmaline Fields*, 1998 WL 874825, at *2.  Rule 16(b) requires that a party seeking to modify a scheduling order show good cause.  *See* FED. R. CIV. P. 16(b); *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996).  To demonstrate "good cause," the movant must show that, despite diligence, he could not have reasonably met the scheduling deadline.  6A WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE, § 1522.1 at 231 (2d ed.1990).  In the context of a motion for leave to amend, the court may deny the motion if the movant "knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint." *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir.1994); *Pope*

*v. MCI Telecommunications, Inc.*, 937 F.2d 258, 263 (5th Cir. 1991) (denying, under Rule 15(a)'s more lenient standard, a late-filed motion to amend a complaint to include claims based on same facts); *Sosa*, 133 F.3d at 1419 (denying leave to amend under Rule 16(b) when the facts were known to plaintiff at the time of the first complaint); *Parker,* 204 F.3d at 340 (same).

If a movant establishes "good cause" to extend the deadline for pleading amendments, the court decides whether to grant leave to file the amended pleading under Rule 15(a).  *See Johnson*, 975 F.2d at 608; *Tschantz*, 160 F.R.D. at 571; *American Tourmaline Fields*, 1998 WL 874825, at *2.  In deciding whether to grant leave to file an amended pleading, a district court may consider factors such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

The defendants seek to amend their answer in two respects.  The first is to deny Count IX in the first amended complaint, which is RE/MAX's claim for cancellation of Trend Setter's trademark. (Docket Entry No. 52).  The second is to replace paragraph 79 in the answer, which recites the defendants' claim for cancellation of RE/MAX's Registration No. 1,702,048.  The paragraph reads:

> RE/MAX's color design mark in Registration No. 1,702,048 consists solely of the colors of the flag of the United States of America, namely red, white and blue, displayed in a horizontal pattern similar to the pattern contained in the flag of the United States of America.

(Docket Entry No. 11 at ¶ 79).  Paragraph 89 of the proposed amended answer reads:

> RE/MAX's color design mark in Registration No. 1,702,048 consists of or comprises the flag or coat of arms or other insignia of the

13

> United States, or of any State or Municipality, or of any foreign
> nation, or any simulation thereof.

(Docket Entry No. 52 at ¶ 89).

The defendants' reason for amending the answer is that the original answer was "intended to track the language of 15 U.S.C. §1052(b)" and the proposed amendment would "allow the paragraph and the allegations therein to track the language more closely" and allow the court to decide their claims on the merits rather than on "technicalities." (Docket Entry No. 51 at 2). This characterization of the second part of the proposed amendment is questionable. The proposed amendment to replace paragraph 79 of the answer with paragraph 89 of the proposed amended answer does not, as the defendants suggest, merely enhance the accuracy of their presentation and use of the statutory language. Rather, the proposed amendment presents a new and different basis for asserting that RE/MAX's Registration No. 1,702,048 should be cancelled. (Docket Entry No. 55 at 20-22). Section 1052(b) prohibits registration of trademarks consisting of a "flag or coat of arms or other insignia of the United States or of any State or municipality, or of any foreign nation, or any simulation thereof." 15 U.S.C.§ 1052(b). The defendants' original answer asserted that the red-over-white-over-blue mark comprises the United States flag. The proposed new answer asserts that the mark comprises the flag of the Netherlands and the flag of Luxembourg. (Docket Entry No. 55 at ¶¶ 61-67).

The defendants argue that this change will not cause prejudice because RE/MAX "has already pled and denied any of its trademarks are prohibited by 15 U.S.C. §1052(b)." (Docket Entry No. 51 at 2). But the "good cause" requirement of Rule 16 focuses on the diligence of the party asking the court to modify the scheduling order. *Parker,* 204 F.3d at 340; *In re Milk Prods.,* 195

14

F.3d at 437; *Johnson,* 975 F.2d at 609; *Marcum v. Zimmer,* 163 F.R.D. 250, 254 (S.D.W.Va. 1995). The absence of prejudice to the nonmovant is relevant to Rule 15(a) but does not satisfy the "good cause" requirement of Rule 16(b). *Tschantz,* 160 F.R.D. at 571. The defendants have not shown good cause for the delay in raising this additional ground under § 1052(b) or for denying the claim for cancellation.[3]

In addition, this court denies the motion for leave to amend as futile. Even assuming that the defendants oppose the cancellation of their mark, this court finds and concludes that, on the merits, RE/MAX is entitled to such relief. This court also finds and concludes that the defendants' claims for cancellation of RE/MAX's marks on the basis of § 1052(b) are without merit, taking into account the allegations that the marks resemble not only the United States flag but the flags of the Kingdom of the Netherlands and Luxembourg.

The defendants' motion for leave to amend their answer is denied.

## V.    The Trademark Infringement and Unfair Competition Claims

RE/MAX contends that it is entitled to judgment as a matter of law that the defendants are infringing on its federal trademarks because the red, white, and blue Trend Setter signs are likely to cause confusion as to the source of Trend Setter's services.    (Docket Entry No. 45 at 14). RE/MAX argues that the undisputed facts show that: (1) the defendants' red-over-white-over-blue

---

[3] This is not the first time the defendants have failed to meet filing deadlines in the course of this litigation. When RE/MAX sent the defendants interrogatories and requests for admission and production on November 1, 2007, the defendants failed to file objections or a response until March 11, 2008 and did not request an extension.    In their subsequent motion for leave to submit delayed responses and objections to RE/MAX's interrogatories and requests for production, the defendants argued that their "search for new counsel with more experience in trademark matters" had caused the delay.  (Docket Entry Nos. 23, 24).  As stated in the May 9, 2008 Order, the defendants' excuse did not satisfy the good cause requirement.  (Docket Entry No. 31).  The defendants asserted identical excuses for failing to make timely objections to the interrogatories and for responses to the requests for admission.  But the record showed that their new lawyer had been involved earlier.  And the absence of an experienced trademark attorney did not explain or excuse the failure to request an extension of time or provide information not requiring trademark expertise.  (*Id.*).

mark and signs are "virtually identical" to RE/MAX's marks and signs; (2) the services offered by the two real estate brokerage agencies are identical; (3) both firms promote their services in similar advertising channels; (4) they cater to the same classes of consumers; and, "most importantly, (5) [RE/MAX's] empirically-conducted survey provides strong evidence that consumers have actually been confused as to the source, affiliation or connection of Defendants' services." (*Id.*).

The defendants oppose RE/MAX's motion for summary judgment on the ground that neither their mark nor its use on yard signs is likely to cause confusion among consumers. (Docket Entry No. 55 at ¶ 41, 42). The defendants concede that they offer services identical to RE/MAX's and promote their services in similar advertising channels to an identical class of consumers. (*Id.* at ¶ 45). The defendants argue that their marks are not likely to cause confusion because the signs are not sufficiently similar; the survey conducted by RE/MAX is insufficient to demonstrate that consumers have actually been confused as to source, affiliation, or connection; and there is insufficient evidence that the defendants intended to "pass off" their services as originating from or connected to RE/MAX. (*Id.* at ¶ 41, 45). The defendants argue that there are material issues of fact precluding summary judgment. (*Id.* at ¶ 42).

Section 32 of the Lanham Act provides a cause of action for infringement when, without the registrant's consent, one uses "in commerce, any reproduction, counterfeit, copy[,] or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive. . . ." 15 U.S.C. § 1114(1)(a). To prove infringement, a plaintiff must show that he owns a legally protectable mark and that there is a likelihood of

confusion between that mark and the defendants' allegedly infringing material. *American Rice Inc. v. Producers Rice Mill, Inc*., 518 F.3d 321, 329 (5th Cir. 2008).

The Fifth Circuit assesses likelihood of confusion based on the following factors, which it refers to as "digits of confusion": "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendants' intent; (7) actual confusion; and (8) degree of case exercised by potential purchasers." *Id.* (citing *Oreck Corp. v. U.S. Floor Systems, Inc*.. 803 .2d 166, 170 (5th Cir. 1986); *Sun-Fun Products v. Suntan Research & Dev*., 656 F.2d 186, 189 (5th Cir. 1981)). After assessing each digit, the court must weigh them to determine whether is a likelihood of confusion. "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Elvis Presley Enters. Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (quoting *Conan Properties, Inc. v. Conans Pizza*, 752 F.2d 145, 150 (5th Cir. 1985)).

The likelihood-of-confusion standard used in Lanham Act infringement analysis also applies to RE/MAX's federal and state unfair competition claims*, its Texas statutory trademark infringement claim, and its common-law trademark infringement claim. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 592 (5th Cir. 1993); *Scott Fetzer Co. v. House of Vacuums Inc*., 381 F.3d 477, 483-84 (5th Cir. 2004). Although likelihood of confusion is generally a fact question, *Elvis Presley Enters.,* 141 F.3d at 196, summary judgment may be proper if the undisputed facts in the "summary judgment record compel[] the conclusion that the movant is entitled to judgment as a matter of law*." *Board of Supervisors for Louisiana State Univ. Agric. &*

17

*Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) (citing *Beef/Eater Rests., Inc.*

*v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir.1968)).

**A.      Possession of a Legally Protectable Mark**

The first element of trademark infringement is possession of a legally protectable mark.

*American Rice,* 518 F.3d at 329.  To be protectable, a mark must be distinctive, either inherently or

by achieving secondary meaning.  *Id.*  (citing *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536

(5th Cir. 1998) (abrogated on other grounds by *TrafFix Devices, Inc. v. Marketing Displays, Inc.,*

532 U.S. 23, 32-33 (2001)) (citations omitted)).  RE/MAX has three federally registered marks and

one Texas mark.  (Docket Entry No. 45, Exs. A, B).  Under the Lanham Act, RE/MAX's certificate

of registration for each of its federal trademarks is prima facie evidence of the validity of the mark

and of RE/MAX's exclusive right to use it in connection with real estate brokerage and insurance

brokerage services. 15 U.S.C. § 1057(b), § 1115(a).  RE/MAX's three federal trademarks have been

registered and used in commerce for over five years, achieving incontestable status.  15 U.S.C. §

1065; *see also American Rice*, 518 F.3d at 330.  Once a mark becomes incontestable, its federal

registration constitutes conclusive evidence of its validity, subject only to the defenses enumerated

in the Lanham Act, including that the mark has been abandoned or that it is generic.  § 1115(a); *see*

§ 1115(b)(2), § 1065 (4); *see also American Rice*, 518 F.3d at 330.

The defendants concede the validity and incontestable status of RE/MAX's federal

Registration No. 1,691,854 and No. 1,720,592, each comprising three red-over-white-over-blue

horizontal bars with a slanted hot-air balloon in the top left corner.  The defendants challenge the

validity of RE/MAX's federal Registration No. 1,702,048, comprising three red-over-white-over-

blue horizontal bars without a balloon, on three grounds:  it comprises a flag, prohibited under §

18

1052(b); RE/MAX has abandoned and/or mutilated this mark, prohibited under §1065; and it is generic, prohibited under § 1064(3), 1065(4). (Docket Entry No. 11 at ¶¶ 105—110). Each of the defendants' arguments for invalidity and cancellation is addressed below. The likelihood-of-confusion analysis applies to all the RE/MAX trademarks, including the indisputably valid Registration No. 1,691,854 and No. 1,720,592 (with the hot-air balloon) and No. 1,702,048 (without a balloon).

### B.    The Likelihood of Confusion

The second element of trademark infringement is the likelihood of confusion. *American Rice,* 518 F.3d at 329. The factors for establishing a likelihood of confusion are: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used (6) the defendant's intent; (7) actual confusion; and (8) degree of case exercised by potential purchasers." *Id.*

### (1)    The Strength of the Mark

"The stronger the mark, the greater the protection it receives. . . ." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998). A trademark's strength is determined by the quality of the mark and, more importantly, by the degree to which it is recognized in the marketplace. *American Rice,* 518 F.3d at 330; *Sun Banks of Florida, Inc. v Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981). Marks can be classified as generic, descriptive, suggestive, or arbitrary and fanciful. *Id.* "[W]ithin this spectrum, the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *American Rice,* 518 F.3d at 330 (citing *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc*. 725 F.2d 336, 346 (5th Cir. 1984)). Marketplace recognition depends on "advertising, length of time in business, public

recognition, and uniqueness." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).

RE/MAX's trademarks all include a rectangular design consisting of three evenly spaced horizontal bars, with the top red, the middle white, and the bottom blue. RE/MAX's Trademark Registration No. 1,691,854 and No. 1,720,592 also contain a slanted red, white, and blue hot air balloon in the top left corner. RE/MAX's federal Trademark Registration No. 1,702048 and RE/MAX's Texas Registration No. 55729 do not contain a balloon. Trend Setter's marks and signs do not have balloons.

The defendants contend that RE/MAX's marks differ in commercial impression and in commercial strength. The defendants argue that it is "patently obvious" that RE/MAX's claims in this suit relate only to the similarity of the Trend Setter signs (which have no balloons) to RE/MAX's conceptually weak tri-bar marks. (Docket Entry No. 55 at ¶ 22). RE/MAX, however, claims to possess ownership to an entire "family" of marks, all of which comprise the red-over-white-over-blue tri-bar feature, and which collectively constitute the "RE/MAX Trademark." (Docket Entry No. 45 at ¶ 1, 3). "A family of marks is a group of marks having a recognizable common characteristic. . . ." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir.1991). "Simply using a series of similar marks does not of itself establish the existence of a family. There must be recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." *Id.* The "recognizable common characteristic" of the RE/MAX "family" is the tri-bar design consisting of equally spaced red, white, and blue bars. (*See* Docket Entry No. 45, Exs. A, B). For RE/MAX to obtain protection for its family of marks,

this common element must be sufficiently strong on its own to deserve such strong protection.[4]

The RE/MAX trademark is best classified as arbitrary. It is not generic because the public identifies it with a particular source, not as identifying real estate services in general.[5] There is no descriptive or suggestive connection between real estate services and three vertical bars or a red, white, and blue color scheme. Such color combinations and design are used in a variety of industries. While classifying a mark as arbitrary weighs in favor of its strength, it does not end the inquiry. A mark's "ultimate strength" depends on "its standing in the marketplace." *Sun Banks,* 651 F.2d at 315.

The summary judgment record reveals that RE/MAX's tri-color designs, including those lacking balloons, have come to develop marketplace significance and serve as source identifiers. RE/MAX has used its tri-color mark continuously for over thirty years, devoting substantial time and resources to developing and maintaining the potency of its marks as source identifiers. (Docket Entry No. 46). RE/MAX has invested billions of dollars developing and maintaining the integrity of its marks in the United States and worldwide. (*Id.*). RE/MAX's Trademark & Graphic Standards meticulously outline the stylistic requirements that RE/MAX imposes on franchisees and affiliates

---

[4]  The family of marks is referred to in the singular as the "RE/MAX trademark" or "the mark."

[5]  To the extent that the defendants claim RE/MAX's Registration No. 1,704,048 should be cancelled because it is generic, their argument fails as a matter of law. A trademark is or may become generic if the public does not identify the mark with a particular source, but instead identifies it with the genus of goods or services in general. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768. The defendants bear the burden in challenging the validity of RE/MAX's registered mark. *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1537 (S.D.Tex. 1996). A generic mark can be cancelled at any time. 15 U.S.C. § 1064(3). RE/MAX's mark can only be deemed generic if it has become emblematic of real estate brokerage services in general and no longer indicates a particular source. A textbook example is "Xerox," which began as a pure indicator of source but evolved into a reference to an entire class of products. The defendants have produced no evidence to support their argument that the public perceives the red, white, and blue design as designating real estate brokerage services in general rather than a particular source of goods and services. (Docket Entry No. 45 at 23). The results of RE/MAX's survey provide evidence to the contrary, indicating that at least some consumers associate the red, white, and blue yard signs specifically with RE/MAX. (Docket Entry No. 45 at 23; Docket Entry No. 47-4 at 8-10). The defendants fail to raise an issue of fact as to whether Registration No. 1,704,048 is generic.

using the RE/MAX brand, to ensure "[p]roper use of RE/MAX trademarks" and "protect[] [RE./MAX's] hard-earned goodwill." (Docket Entry No. 55-2 at iv). All of these efforts evidence the mark's strength.

RE/MAX's empirical survey provides evidence that consumers associate RE/MAX's tri-bar marks with RE/MAX real estate brokerage services. (Docket Entry No. 47). 25.3 percent of Houston-area survey respondents shown the Trend Setter sign thought that the sign was either promoting RE/MAX, promoting a company affiliated with RE/MAX, or promoting a company that would have needed RE/MAX's permission to use the sign. (*Id.*). Most of the survey participants making up that 25.3 percent based their responses specifically on the red, white, and blue color and arrangement of the Trend Setter sign. (Docket Entry No. 47-4 at 8-10). For example, one respondent explained that he thought RE/MAX was the company being promoted or advertised by the Trend Setter sign "[b]ecause its (sic) their sign, they are the only one's (sic) that I know of that have this color of sign…The red, white and blue sign…they have always had this color of sign." (*Id.* at 8). Another said he thought the company being promoted by the Trend Setter sign was affiliated with RE/MAX because "[i]t looks exactly like a Remax (sic) sign. The sign is red, blue and white just like a remax (sic) sign." (*Id.* at 9).

The survey evidence, both statistical and anecdotal, of actual consumer association demonstrates the substantial market force of the RE/MAX trademark in the Houston area. This court finds that the RE/MAX trademark is strong, weighing in favor of finding a likelihood of confusion.

### (2) *The Similarity of the Marks*

The next factor considers the similarity between "the marks in the context that a customer

perceives them in the marketplace, which includes their presentation in advertisements." *Elvis Presley Enters*, 141 F.3d at 197. The court must not restrict itself to a comparison of individual features, but must consider "the commercial impression created by the mark as a whole." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir.1980) (citation omitted). "'The relevant inquiry is whether, under the circumstances of the use,' the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Elvis Presley Enters.*, 141 F.3d at 201 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 cmt. c (1995)).

RE/MAX argues that a side-by-side comparison of the parties' real estate yard signs supports a likelihood-of-confusion finding. RE/MAX notes that the Trend Setter sign, like RE/MAX's sign, has three "color bands," the top of which is red, the middle of which is white, and the bottom of which is blue, and that the relative width of the three bands on the Trend Setter signs are the same as the widths of the bars on RE/MAX's signs. (Docket Entry No. 45 at 16). The defendants argue that despite the similarity in color scheme, the signs are sufficiently different that the overall impression conveyed to consumers does not create a likelihood of confusion.

The defendants point out several differences. The RE/MAX sign contains the distinctive red, white, and blue RE/MAX hot-air balloon in the left corner, while the Trend Setter sign does not. The RE/MAX sign has three equally sized horizontal bars, while the Trend Setter sign includes a stylized representation of a house in the middle white portion, and, consequently, the Trend Setter color bands are not equally sized and the red and white portions are not simple horizontal bars. The text elements on the two signs are also different. "For Sale" appears on different areas of the top red portions. TSR's name and RE/MAX's name appear on different areas. The individual agent's

name appears in different areas.  The typeface is different.  And the realtor logos are different.
(Docket Entry No. 55 at ¶ 45(a)).

Dissimilarities in individual features may be insufficient to distinguish otherwise similar
marks in the eyes of consumers, especially when the "dominant" elements of a mark or the
"attention-getting" features are similar or identical.  *Elvis Presley Enters*., 141 F.3d at 201-02 (citing
*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc*., 43 F.3d 922, 936 (4th Cir.1995); *Oreck
Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 161,171).  Minor differences in style, such as different
typefaces, are particularly unhelpful for distinguishing marks in the eyes of consumers.  *See Scott
Fetzer Co.,* 381 F.3d at 486, n. 4 (citation omitted).  In this case, despite the presence or absence of
certain elements in Trend Setter signs as compared to RE/MAX signs, including differences in the
shape of the color bands, the balloon, and text placement, the dominant feature of both signs is
identical.  Both Trend Setter and RE/MAX signs have the same color schemes and virtually identical
placement and arrangement of the colors.  The red, white, and blue tri-bar color arrangement is a
dominant feature of the RE/MAX marks and of the Trend Setter marks.  As the survey responses
reveal, the tri-bar red-white-and-blue is the significant "attention-getting" feature on both the
RE/MAX and Trend Setter signs.  (Docket Entry No. 47).  This similarity in color and arrangement
supports the conclusion that the signs are similar in their overall commercial impression. *See Smack
Apparel*, 550 F.3d at 480 (noting that "[a]lthough the [defendant's] shirt [did] not use the initials
"LSU" anywhere, its identification of [Louisiana State University] as the national champion [was]
unmistakable from the [purple and gold] colors and from the references to the games in which LSU
played.").

"'The setting in which a designation is used affects its appearance and colors the impression

24

conveyed by it.'" *Amstar*, 615 F.2d at 261 (quoting RESTATEMENT OF TORTS § 729, cmt. b (1938)).

A real estate yard sign is intended to catch the attention of people driving past.  The details on the

signs, such as text content and placement, are not what catch and hold attention.  In this context, the

color and dominant design are more important because, unlike words or even logos, they can

communicate a source to consumers viewing the signs from a distance, or while passing, without

requiring significant or prolonged attention. To a consumer driving by, the red, white, and blue tri-

bar design stand out, not differences in smaller, less significant design elements.

The defendants also argue their sign is not red, white, and blue because the middle portion

of the Trend Setter mark is not white but "colorless."  (*Id.* at ¶14).  This argument is contradicted

by their own federal Registration No. 3,222,708, which states:

> The colors red, white and blue are claimed as a feature of the mark.  The color red
> appears in the top portion of the rectangle, the color white appears in the stylized
> representation of the house, and the color blue appears in the bottom rectangle.

(Docket Entry No. 11, Exhibit A).  Even if the Trend Setter mark middle space is "colorless," it

appears as white.  The court must "consider the marks in the context that a customer perceives them

in the marketplace, which includes their presentation in advertisements." *Elvis Presley Enters, Inc.*,

141 F.3d at 197.  The Trend Setter marks and advertisements all use the same red, white, and blue

color scheme and similar vertical bar arrangement as the RE/MAX marks and advertisements.

In sum, despite some differences, the signs are similar enough in their most significant

features to cause confusion in the market for real estate brokerage services.

### (3)     The Identity of Services Offered

The defendants concede that they offer real estate brokerage services identical to those

offered by RE/MAX.  (Docket Entry No. 55 at ¶ 45).  This factor weighs in favor of finding a

likelihood of confusion.

> (4)     *The Identity of the Purchasers*

The defendants concede that they market or intend to market their services to the same group of customers as RE/MAX.  This group is  "the general public with an interest in purchasing or selling real estate."  (Docket Entry No. 45 at 17; Docket Entry No. 55 at ¶ 45).   This factor weighs in favor of finding a likelihood of confusion.

> (5)     *The Similarity of Advertising Channels*

The defendants concede that they promote their real estate services in the same marketing and advertising channels as RE/MAX, including.  (Docket Entry No. 55 at ¶ 45).  Most significantly, both companies rely heavily on yard signs.  (Docket Entry No. 55 at ¶¶ 3-4).

> (6)     *The Intent to Confuse the Public*

 "Proof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement."  *Oreck*., 803 F.2d at 173.  "If, however, a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'"  *Exxon Corp. v. Texas Motor Exch. Of Houston, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980) (quoting RESTATEMENT OF TORTS § 729, cmt. f (1938)).

RE/MAX asserts that the circumstantial evidence in the record indicates that the defendants intended to pass off their services as associated with or approved by RE/MAX.  The record shows that the defendants were aware of the RE/MAX trademarks at least as early as December 1996. (Docket Entry No. 45, Ex. G at 7).  Deborah Miller worked as a RE/MAX affiliate before joining Trend Setter, during which time she listed several properties – using a RE/MAX sign – on behalf

26

of Pavnouty Abraham.  (Docket Entry No. 45 at 18; Docket Entry No. 45-10 at 41-42).  RE/MAX

has submitted an invoice from Ad-Mar Signs, dated November 30, 1998, showing that Abraham

ordered ten real estate yard signs on behalf of his prior business, Realty, Etc, containing the same

red-over-white-over-blue design that Trend Setter subsequently used and trademarked.  (Docket

Entry No. 45-11 at 126-28, Exhibit 3).  The invoice is for ten steel sign panels with a "White

background w/ R/M red and blue" and states, "Imprint: Per Customer Specifications."  (Docket

Entry Nos. 45 at 18,  45-11 at 127-28, Ex. 3).

    In some situations, a defendant's use with "knowledge of the predecessor's mark may give

rise to the presumption that the defendant intended to cause public confusion."  *Scott Fetzer Co.*, 381

F.3d at 486 (citations and quotation marks omitted).   But mere knowledge of a prior user's mark

is generally not sufficient to infer bad faith.  *Conans Pizza,* 752 F.2d at 150.  The record evidence

does not support a finding of a bad faith intent to mislead.  The record includes Abraham's statement

that he did not adopt a red, white, and blue design with any intent to cause confusion and that his

decision was unrelated to RE/MAX's use of those colors.  (Docket Entry No. 55 at 13).  When asked

in his deposition why he chose the design, Abraham responded: "That's a dream.  That's the

American flag colors."  (Docket Entry No. 55-5 at 315, Lines 6-7).

    It is telling, the defendants argue, that "[p]rominent on each of [Trend Setter's] signs, even

more so than RE/MAX's own signs, is the phrase "Trend Setter Realty" appearing in the largest

typeface of any other information and which spans the entire width of the sign."  The defendants

argue that this clear display of source is inconsistent with an intent to "pass off" their services as

RE/MAX's.  (Docket Entry No. 55 at 14).  As for the 1998 Ad-Mar invoice, the defendants contend

27

that it is unclear that "R/M" stands for "RE/MAX."[6]   The defendants point to evidence that Abraham told Ad-Mar only what colors the signs should be and did not "specify RE/MAX white and blue or red and blue."  The defendants contend that Ad-Mar, not Abraham,  wrote "R/M" on the invoice.[7]  (Docket Entry No. 55-5 at 130, 313).

Because the defendants are the nonmoving party, this court may not consider the credibility of Abraham's testimony for the purposes of deciding this motion.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The record does not permit the conclusion that, as a matter of law, the defendants acted with the intent to deceive.  The fact that the "Trend Setter" name is displayed in very large bold letters across the white portion of the signs weighs in the defendants' favor.  *See Skechers U.S.A., Inc. v. Vans, Inc*., 2007 WL 4181677, *8 (C.D.Cal. Nov. 20, 2007) ("[A]lthough Skechers does not deny that it knew of the Vans design when it designed its shoes, the clear labeling of the accused shoes with Skechers' brand negates any inference of intent to trade on Vans' mark.").

An intent to mislead is not required for a finding of infringement.  "If the defendant acted in good faith, then this digit of confusion becomes a non-factor in the likelihood-of-confusion analysis."  *Elvis Presley Enters*., 141 F.3d at 203.  This factor favors neither party.

### (7)    *Actual Confusion*

---

[6] When asked what "R/M" meant in the context of the invoice, Abraham said that he had "no idea."  (Docket Entry No. 45-11 at 128).  Miller stated that she was "sure [she] may have" seen the R/M abbreviation during her involvement with RE/MAX but had never used the term herself and was "under the impression that it had to be spelled out."  (Docket Entry No. 45-10 at 92).

[7] The record does not foreclose the possibility that Ad-Mar referred to the "RE/MAX colors" independently.  The RE/MAX Trademark & Graphics Standards indicate that RE/MAX suppliers of advertising products and services and RE/MAX franchisees must use particular "RE/MAX colors" on RE/MAX yard signs to meet the standards – "what paint manufacturers sometimes call Bright Red and Brilliant Blue," or "PMS 186" and "Reflex Blue" in the Pantone Matching System.  (Docket Entry No. 55, Exs. 1, 2).  It could be that "R/M red and blue" was Ad-Mar's term for the colors commonly ordered by RE/MAX affiliates and that they simply assumed Abraham wanted those shades of red and blue.

28

"Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." *Amstar*, 615 F.2d at 263 (citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975). A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both. *Compare Moore Bus. Forms Inc. v. Ryu*, 960 F.2d 486, 491 (5th Cir. 1992) *with Scott Fetzer Co. v. House of Vacuums, Inc*., 381 F.3d 477, 486 (2004) (citations omitted). RE/MAX relies on survey evidence. (Docket Entry No. 47).

RE/MAX and Trend Setter have concurrently used their marks in connection with providing real estate services in the Houston area since at least March 2005. (Docket Entry No. 55 at 6). Abraham may have been using similar signs on behalf of Realty, Etc. as early as 1998. (Docket Entry No. 45-7 at 3).[8] By the end of 2005, Trend Setter had between 150 and 200 agents advertising their real estate brokerage services using red, white, and blue Trend Setter yard signs. (Docket Entry No. 45 at 10). By mid-2008, Trend Setter had approximately 700 agents. (*Id.*) RE/MAX does not include evidence of actual incidents of confusion. The absence of such evidence, despite at least 24 months of concurrent use in a similar geographic area, must be considered. *See Oreck Corp.,* 803 F.2d at 173 ("In light of the concurrent use of the [marks] for seventeen months, [plaintiff's] inability to point to a single incident of actual confusion is highly significant."); *see also Amstar*, 615 F.2d at 263 ("Indeed, the fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future."). But courts also recognize that even if

---

[8] Abraham purchased 10 red, white, and blue yard signs in 1998 on behalf of Realty, Etc. The record does not include evidence of how the signs were used.

there has been a significant period of concurrent use of the marks, evidence of actual confusion can be "difficult to find. . .because many instances are unreported." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir.2001).

To help establish likelihood of confusion, a plaintiff may present survey evidence instead of direct evidence of confusion. *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 486 (2004) (citations omitted). RE/MAX has offered a survey designed and commissioned by Robert Peterson, a professor of marketing at the University of Texas at Austin, editor-in-chief of two major academic marketing journals, author of many articles dealing with research methodology and brand naming, and recipient of several awards for his contributions to marketing research. (Docket Entry No. 47 at ¶¶ 1-4). The survey consisted of 225 individuals in the Houston metropolitan area over 18 years of age and either using, recently having used, or considering the use of a real estate agent or broker to purchase or sell a home. (Docket Entry No. 47 at ¶¶ 7-10). In this survey, 150 individuals were shown a picture of Trend Setter's red-over-white-over-blue yard sign pitched in front of a house, with "Trend Setter Realty" written across the front in large typeface. (*Id.*; Docket Entry No. 47-4, Attachment 5). The survey asked a series of open-ended questions regarding what company was being promoted or advertised by the sign. (Docket Entry No. 47 at ¶ 15). Of those participating, 25.3% stated either that: (I) RE/MAX was the company being promoted or advertised by the sign (16.7% of the sample); (ii) the company being promoted or advertised by the sign was affiliated or connected with RE/MAX (7.3%); or (iii) the company being promoted or advertised by the sign would have to get permission or approval from RE/MAX to use the sign (1.3%). (*Id.* at ¶ 18; Docket Entry No. 47-4 at 7-10). The survey also asked the same questions of a control group of 75 individuals shown a modified Trend Setter sign with the red and blue bars removed but

30

otherwise unchanged.  (Docket Entry Nos. 47 at ¶¶ 9, 16, 47-4 at 12).  Only 2.7% of these individuals mentioned RE/MAX as the company being promoted by the sign, a figure that is "not statistically different from zero."  (Docket Entry No. 47 at ¶ 20).

A plaintiff submitting a survey must demonstrate that it is an accurate reflection of consumer confusion.  Two factors affect the weight given to such surveys: the question format and how the survey is conducted.  *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447 (5th Cir. 1973).  Survey questions cannot properly suggest a link between the defendant's business and the plaintiff, but must permit participants to make their own associations.  *Scott Fetzer Co.*, 381 F.3d at 488.  And the questions must take into account other factors that might contribute to participants associating the defendant's mark with the plaintiff.  *Holiday Inns*, 481 F.2d at 448.  "For a survey to be valid, 'the persons interviewed must adequately represent the opinions which are relevant to the litigation' and 'include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.'"  *Scott Fetzer Co.*, 381 F.3d at 487-88 (quoting *Amstar,* 615 F.2d at 264).  Only when "serious flaws in a survey will make any reliance on that survey unreasonable" and "[n]o reasonable jury could view the proffered survey as evidence of confusion among relevant consumers" should the survey be discounted entirely.  *Scott Fetzer Co.*, 381 F.3d at 488.

RE/MAX's survey meets the criteria for reliability.  The survey included a fair sampling of potential real estate brokerage service users.  (Docket Entry No. 47 at ¶¶ 7-8).  The survey questions did not suggest an affiliation with RE/MAX or a link between RE/MAX and Trend Setter.  Instead, the questions asked which company the participants thought was being promoted or advertised by the signs and why.  (*Id.* at ¶ 15).  Nor did the survey questions simply ask whether the Trend Setter sign brought any other company to mind.  Rather, the survey asked what about the sign elicited the

31

participants' responses.  (*Id.*).

In addition, RE/MAX has submitted verbatim responses of the 25.3% of those participating who stated either: (i) that RE/MAX was the company being promoted or advertised by the sign; (ii) that the company being promoted or advertised by the sign was affiliated or connected with RE/MAX; or (iii) that the company being promoted or advertised by the sign would have to get permission or approval from RE/MAX to use the sign.  (Docket Entry No. 47-4 at 8-10).  The survey showed that many of the participants based their responses specifically on the red, white, and blue colors and arrangement of the sign.  (*Id.*).  The survey responses also demonstrate that, for at least some participants, the presence of the name "Trend Setter" on the defendants' signs did not eliminate confusion with RE/MAX.  Some respondents thought they saw the name "RE/MAX" on the Trend Setter sign, despite the presence of the words "Trend Setter" in bold face across the middle.  (*Id.* at 8).  One participant said that he thought a Trend Setter sign was a RE/MAX sign because he "remember[ed] seeing an 'R' on the top right corner."  (*Id.*).  One participant "saw ReMax (sic) name on the sign."  (*Id.*).

The defendants do not argue that the survey methodology was flawed or that its results are unreliable.  They do not dispute that the survey should be given "appropriate consideration." (Docket Entry No. 55 at 15).  Rather, the defendants argue that even if the survey is accurate, the results do not deserve significant weight because countervailing circumstances lessen their impact and support the contrary position that consumers are not likely to be confused in the marketplace. (*Id.*).

First, the defendants point out that the survey only shows a 25.3% confusion level and "also unmistakably reveals that 74.7% of the individuals show[n] (sic) the unmodified sign did not believe

the company being promoted was RE/MAX." (Docket Entry No. 55 at 15) (emphasis removed). This argument is unpersuasive. The Fifth Circuit gives strong weight to evidence of actual confusion, holding that "very little proof of actual confusion would be necessary to prove the likelihood of confusion." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (1971). Other courts have upheld the finding of a likelihood of confusion based on survey results showing that as few as 10% of the respondents were confused. *See Mutual of Omaha Ins. Co. v. Novak* , 836 F.2d 397, 400-01 (8th Cir. 1987) (finding that survey showing 10% confusion rate indicates enough actual confusion to play a "significant" role in court's finding of likelihood of confusion); *see also Goya Foods, Inc. v. Condal Distribs., Inc*., 732 F. Supp. 453, 457 (S.D.N.Y. 1990) (accepting 10% rate of confusion as enough to support granting the plaintiff a preliminary injunction); *Wendy's Int'l, Inc. v. Big Bite, Inc*., 576 F. Supp. 816, 823-24 (S.D. Ohio 1983) (finding surveys showing 7-21.1% of consumers actually confused sufficient to support granting preliminary injunction, even though surveys were flawed). On this record, a 25% confusion rate result is sufficient to support the conclusion that there is actual confusion among real consumers.

The defendants next argue that the survey fails to take into account the reality of real estate transactions. (Docket Entry No. 55 at 15). The defendants point out that the surveyed individuals "were only able to review the picture of the [Trend Setter] sign for a few minutes before the picture was taken away," while in the "real world" consumers would have "ample opportunity" to "read the sign up close," see the name "Trend Setter" across the front, and infer that this was indeed a different company than RE/MAX. (Docket Entry No. 55 at 16). In addition, the defendants argue that a person buying a "big ticket" item such as a house would "ordinarily be expected to be a more careful buyer than the impulse purchaser or the purchaser of a relatively inexpensive item." (*Id.* at

33

15).  Finally, the defendants argue that because purchasers and sellers of real estate act through agents or brokers, "[i]t is more than safe to assume that such an agent or broker would advise the consumer about the property and would be able to inform the customer about who the listing brokerage was."  (*Id.* at 15-16).  As a result, according to the defendants, "actual confusion, if any, would be mitigated beyond the first impression."  (*Id*. at 16).

The defendants' argument that even if consumers are initially confused about the source of the services, they are no longer confused at the point of sale, does not diminish the weight to be given the survey.[9]  "Actual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion.  'Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion.'"  *Elvis Presley Enters.*, 141 F.3d at 204 (quoting 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §§ 23:6- :7 (case citations removed)).  So-called initial-interest confusion, occurring in the early stages of a business transaction, harms the trademark owner even if the prospective customer ultimately recognizes his mistake, because that customer might be diverted to the junior user instead of the trademark owner who expended the time and resources developing customer goodwill.  *See Elvis Presley Enters*, 141 F.3d at 204; *see also* GILSON ON TRADEMARKS, § 5.14[1][a] (2009).  Initial-interest confusion is especially relevant when the parties are direct competitors in the same market.  *See Quantum Fitness Corp. v. Quantum Lifestyle Centers, LLC*, 83 F.Supp.2d 810, 829-30 (S.D.Tex. 1999) (considering initial-interest confusion important to the analysis when both parties were operators of fitness

---

[9] The sophistication and care taken by consumers and their actual awareness of the source is considered as separate factor in the likelihood of confusion analysis.

centers in the same market). The evidence shows that real estate yard signs are designed to draw attention to what can be seen and understood at a distance, on fleeting exposure. Such "drive-by" exposure to the signs increases the risk of initial-interest confusion that would benefit Trend Setter and harm RE/MAX. On this record, the survey evidence shows actual confusion among consumers as to the origin of the services advertised on the Trend Setter yard signs. This factor weighs strongly in favor of finding a likelihood of confusion.

(8)    <em>The Sophistication and Degree of Care of Potential Purchasers</em>

The sophistication and degree of care exercised by potential purchasers of real estate services is a separate factor in the likelihood of confusion analysis. *American Rice*, 518 F. 3d at 333-34. "[C]onfusion is more likely . . . if the products in question are 'impulse' items or are inexpensive." *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 n.9 (5th Cir.1984) (rice); *see also Smack Apparel*, 550 F.3d at 483 (t-shirts). Conversely, "a person buying a 'big ticket' item . . . would ordinarily be expected to be a more careful buyer than the impulse purchaser or the purchaser of a relatively inexpensive item." *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 n.10 (5th Cir. 1979) (carpeting).

Real estate purchases are expensive and complex transactions. Consumers are likely to exercise great care, particularly at the point of purchase. That may reduce the likelihood of confusion. The ordinary consumer of real estate brokerage services, however, is not an expert in real estate brokerage transactions. Instead, the consumer is likely to be a "typical buyer exercising ordinary caution." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir.1991); *see also Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) ("The standard to be employed is the ordinary purchaser, not the expert.")

35

(citations omitted); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999) (the standard is the "reasonably prudent consumer").

In *Oreck*, the Fifth Circuit overturned a jury verdict of infringement in part because it found that the ultimate purchasers of the defendant's carpet cleaning products were "people who are directly responsible for…buying for professional and institutional purposes at a cost in the thousands of dollars" and "virtually certain to be informed, deliberative buyers." *Id.* at 173 (citing *Sun-Fun Products*, 656 F.2d at 191; *Armstrong Cork*, 597 F.2d at 504 n. 10). By contrast, the typical client of a real estate brokerage agency is not an expert in the purchase and sale of real estate or in real estate franchise relationships. RE/MAX is a nationwide real estate brokerage franchise that licenses to other entities the right to use RE/MAX trademarks, service marks, and logos to identify themselves as RE/MAX affiliates. (Docket Entry No. 45 at 1). The survey and other evidence show a likelihood that a prospective or actual client may believe that Trend Setter is a RE/MAX affiliate or sponsored by RE/MAX due to Trend Setter's use of a confusingly similar mark. Miller's long affiliation with RE/MAX affiliate is likely to add to that confusion. The record does not show that Trend Setter customers are "virtually certain to be informed, deliberative buyers" so as to undercut the evidence of actual and likely confusion. *See Oreck,* 803 F.2d at 173.

The defendants also argue that real estate transactions are typically carried out through agents or brokers, who "would be able to inform the customer about who the listing brokerage was." (Docket Entry No. 55 at 16). This argument does not apply to cases in which clients – who do not know they are confused as to the relationship between Trend Setter and RE/MAX – do not ask and

36

the agents – who do not know of the client's confusion – do not provide the information.[10]   And this argument does not address initial-interest confusion.  Even if customer confusion is alleviated at the point of sale, the initial confusion generated by similar yard signs advertising Trend Setter listings is significant and should not be discounted in the likelihood of confusion analysis.  *See Elvis Presley Enters*., 141 F.3d at 204.

In summary, this factor cuts both ways, superficially weighing against finding a likelihood of confusion but tilting in favor of such a finding in other, more important ways.

(9)    *Balancing the Factors*

After assessing each "digit of confusion," the court weighs the factors to determine whether the facts indicate, overall, that there is a likelihood of confusion.  "These digits are not elements of a plaintiff's cause of action, but instead comprise a nonexhaustive collection of considerations that may be relevant to the ultimate factual determination. . . ."  *Society of Financial Examiners v. National Ass'n of Certified Fraud Examiners Inc*., 41 F.3d 223, 228, n. 15 (5th Cir. 1995) (citing *Conans Pizza*., 752 F.2d at 150 ("The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported by even a majority of the seven factors.")).

After a careful assessment of the record,  this court concludes that based on the undisputed facts in the record, as a matter of law, the defendants' use of their red, white, and blue signs in

---

[10] The involvement of trained and informed personnel does not always indicate that consumer confusion as to source will be alleviated.  Indeed, "in some circumstances, the steps in a complex purchase process may actually interfere with the source-identification judgment. If sales personnel are motivated to complete the sale, irrespective of any concern about consumer confusion, they may—consciously or unconsciously—shed more noise than light on the source-identification judgment." Thomas R. Lee, Glenn L. Christensen, and Eric D. DeRosia, *Trademarks, Consumer Psychology, and the Sophisticated Consumer*, 57 EMORY L.J. 575, 616 n. 208 (2008).

advertising is likely to confuse ordinary consumers.  Nearly all the factors weigh in favor of finding a likelihood of confusion.  RE/MAX's red, white, and blue tri-bar marks, while not conceptually distinctive, have become strong source identifiers within the market for real estate brokerage services and have wide consumer recognition.  Trend Setter's mark is similar in color scheme and design, both in the parties' federal Trademark Registrations and as presented to consumers in the marketplace in real estate yard signs.  Both companies advertise similar services using similar advertising means, operate through similar advertising channels, and attract the same class of consumers. (Docket Entry Nos. 45, 55).  The survey evidence shows that 25.3% of a representative sample of consumers were actually confused by the Trend Setter signs, believing them to promote RE/MAX or a RE/MAX affiliate.  (Docket Entry No. 47).  And the individual survey responses reveal that the confusion was due specifically to the red, white, and blue color and arrangement of the Trend Setter yard signs.  (*Id.*).

The lack of evidence of bad faith does not preclude finding a likelihood of confusion or infringement.  *See Elvis Presley Enters.*, 141 F.3d at 203; *American Rice,* 518 F.3d at 332.  The additional factor of sophistication and potential care exercised by consumers does not negate the survey evidence or finding a likelihood of confusion.  This court finds that a likelihood of confusion exists between Trend Setter's signs and the RE/MAX trademark.  Unless the defendants can raise a genuine factual issue on one of their affirmative defenses, RE/MAX will be entitled to judgment as a matter of law on the infringement and unfair competition claims.

### C.    The Affirmative Defenses

The defendants have asserted several affirmative defenses to RE/MAX's infringement and unfair competition claims.  They argue that "RE/MAX's claims are barred by the equitable doctrines

of waiver, laches, estoppel, and acquiescence" because RE/MAX failed to file an opposition to the defendants' trademark registration and failed to sue in a timely manner.  (Docket Entry No. 55 at ¶ 75).  On their affirmative defenses, the defendants have the burden to bring forth facts demonstrating that there are material issues of fact precluding summary judgment for RE/MAX. *Celotex*, 477 U.S. at 324.

"Laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." *Conans Pizza,* 752 F.2d at 153.  Laches requires a showing that the plaintiff (1) delayed in asserting his trademark rights, (2) lacked an excuse for the delay, and (3) thereby caused undue prejudice to the defendant.  *Elvis Presley Enters*., 141 F.3d at 205; *see also Armco, Inc. v. Armco Burglar Alarm Co., Inc*., 693 F.2d 1155, 1161 (5th Cir.1982).  Delay is measured beginning when the plaintiff "knew or should have known" of the alleged infringement.  *Armco*, 693 F.2d at 1161-62. The period of delay ends once the trademark owner objects to the defendant's use and the defendant receives notice of the objection.  *Conans Pizza*, 752 F.2d at 151-52.

The defense of acquiescence requires proving that: (1) the plaintiff knew or should have known of the defendant's use of the trademark; (2) the plaintiff made implicit or explicit assurances to the defendant that it would not assert a claim; and (3) the defendant relied on the assurances. *Conans Pizza*, 752 F.2d at 153.  Permission to use a mark may in some cases be inferred from silence.  *See Elvis Presley Enters*., 141 F.3d at 206.  As with laches, the period during which silence might constitute permission begins when the trademark owner obtains knowledge – actual or constructive – of the defendant's use of his mark.  The period ends when the owner sends a cease-and-desist letter or other clear objection to that use.  *See id* at 205-06.

The defendants' primary argument for laches and acquiescence is that RE/MAX waited nine years before filing suit "despite its knowledge of [Trend Setter's] use of the mark." (Docket Entry No. 55 at ¶ 76). The defendants arrive at this nine-year period of delay by measuring from Abraham's alleged first commercial use of the mark, October 19, 1998, to RE/MAX's filing of this trademark infringement suit on July 25, 2007. (*Id.*). The period between a defendant's first commercial use of its mark and the plaintiff's infringement lawsuit suit is not the relevant period for these equitable defenses. Rather, the period begins on the date the plaintiff obtained actual or constructive knowledge of the allegedly infringing use and ends when the trademark owner objects to the defendant's use and gives notice of the objection by, for example, a cease-and-desist letter. *Elvis Presley Enters.*, 141 F.3d at 205; *Conan Properties*, 752 F.2d at 151-52.

RE/MAX received constructive notice of the Trend Setter mark on March 27, 2007, when Trend Setter was issued its federal Service Mark Registration. (Docket Entry No. 45 at ¶ 23); *Elvis Presley Enters.*, 141 F.3d at 205 (finding that publication in PTO Gazette is constructive notice of the infringer's use of the mark.) But the record indicates that the period should begin earlier. RE/MAX contends that it obtained actual knowledge that Miller and Abraham were using the red, white, and blue signs sometime after Miller left RE/MAX Elite and joined Trend Setter, around March, 2005. (Docket Entry No. 20 at ¶ 25). In similar cases involving suits by trademark owners against former franchisees or licensees who continue to use the owner's marks after the franchise or license agreement ends, courts have held that the relevant period for laches and acquiescence begins once the agreement is terminated. At that point, the trademark owner is put on notice that the franchisee's continued use of the marks is without the owner's authorization. *See, e.g., Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3d Cir. 1998); *Texas Tech*

40

*University v. Spiegelberg*, 461 F.Supp.2d 510 ,527 (N.D. Tex. 2006). Under that standard, RE/MAX

is charged with knowledge that Miller and Trend Setter used the RE/MAX marks when Miller's

contract with RE/MAX was terminated, around February 28, 2005. (Docket Entry No. 45 at 9, ¶

16). Because the defendants have submitted no evidence of any earlier actual knowledge, for the

purposes of this motion, it is appropriate to use February 28, 2005 as the beginning of the period to

measure laches and acquiescence.[11]

The equitable period ended once RE/MAX objected and Trend Setter received notice of

RE/MAX's objection. RE/MAX sent an initial cease and desist letter to Miller on April 18, 2006,

which Abraham also read. (Docket Entry No. 45-11 at 217). RE/MAX also notified Trend Setter

on several occasions of its alleged infringement before Trend Setter's trademark filing on May 30,

2006. (Docket Entry No. 45 at ¶ 21). The period of delay lasted, at the longest, from February 28,

2005 until May 30, 2006, a little over one year. A delay of under two years is not unreasonable as

a matter of law. *See Board of Regents, University of Texas System v. KST Electric, Ltd.,* 550

F.Supp.2d 657, 667 (W.D.Tex. 2008) ("Although it does not seem as though the Fifth Circuit has

ruled on this specific issue, other circuit courts have taken a somewhat uniform approach, granting

at least a two-year window, and sometimes more, for the owner of a mark to file a claim.") (citing

numerous cases with windows of two years or more); *see also Mary Kay, Inc. v. Weber*, 601

F.Supp.2d 839, 860 (N.D. Tex. 2009) (holding that three years is not an unreasonable delay for

enforcing trademark rights).

---

[11] There is no indication that RE/MAX had reason to know of Abraham's earlier use of the signs at issue. The record shows that Realty, Etc. was not large. Abraham only purchased ten yard signs from Ad-Mar for Realty, Etc. In her deposition, Miller testified that she did not even know Realty, Etc. had existed at that time. She believed that it was "long closed down" when she joined Trend Setter and speculated that it was only open for "a year or so" and not in operation in 2000. (Docket Entry No. 45-10 at 45). Purchasing ten yard signs is not sufficient to show that Abraham was using the mark continuously and openly so as to put RE/MAX on notice before February 2005.

The undisputed facts show that, as a matter of law, laches and acquiescence do not apply. RE/MAX did not delay in filing suit so as to give "implied permission" for Abraham to use the RE/MAX trademark. And there is no evidence of prejudice to Trend Setters from the one-year period. *See Elvis Presley Enters*., 141 F.3d at 205-06 (noting that even if an eight-month delay in asserting rights were shown to be unreasonably long, "no undue prejudice has been shown as a result" to support laches defense).[12] The record does not disclose a genuine issue of disputed fact supporting the affirmative defenses of laches, waiver, estoppel, and acquiescence. These defenses do not preclude granting RE/MAX's motion for summary judgment of infringement.

The same legal standard applies to Lanham Act infringement claims, Texas statutory trademark infringement claims, Texas common-law trademark infringement claims, and federal and state unfair competition claims. *See Matrix Essentials*, 988 F.2d at 592; *Scott Fetzer Co*., 381 F.3d at 483-84. Because there is a likelihood of confusion and no applicable affirmative defense, this court grants RE/MAX's motion for summary judgment on its trademark infringement and unfair competition claims.

## VI.    RE/MAX's Claim for Cancellation

Section 37 of the Lanham Act provides that "[i]n any action involving a registered mark the court may . . . order the cancellation of registrations, in whole or in part." 15 U.S.C. § 1119. "The

---

[12] It is unclear whether the Fifth Circuit recognizes a separate defense of waiver or estoppel in the trademark context, and the defendants have cited no authority supporting either defense. In other substantive areas, under Texas law, "[w]aiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). Waiver is more difficult to prove than either laches or acquiescence, as it involves not sleeping on one's rights but intentionally relinquishing them. Although the Lanham Act refers to estoppel, it appears to be an umbrella term encompassing laches and acquiescence as well as two technical forms of estoppel that do not apply here. 3 GILSON ON TRADEMARKS § 11.08[3][I] (2009). Even if waiver or estoppel are separate defenses, the absence of any disputed fact issues on the laches and acquiescence defenses supports granting summary judgment.

exercise of that broad power of judicial review should be informed by the legislative purposes that motivated the enactment of the Lanham Act." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 213 (1985); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co*., 494 F.2d 3, 13-14 (5th Cir. 1974) (ordering cancellation because the "[Lanham] Act's purposes would be served by ordering the cancellation of the registration."). RE/MAX argues that this court should exercise its statutory authority and cancel Trend Setter's federal Registration No. 3,222,708 because the mark is likely to cause confusion with RE/MAX's previously registered marks. Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), provides that the PTO may refuse to register a trademark that "[c]onsists of or comprises a mark which so resembles . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive. . . ." 15 U.S.C. § 1052(d) (Supp. 2004). When a mark is less than five years old, it may be cancelled on the ground that it would have been barred from registration in the first instance under § 2(d). 15 U.S.C. § 1052(d).

The test under § 2(d) is the same likelihood-of-confusion analysis used in trademark infringement cases. 3 McCarthy on Trademarks and Unfair Competition, § 20:15, 20:53 (2009); *see also Shen Mfg. Co., Inc. v. Ritz Hotel, Ltd*., 393 F.3d 1238 (Fed. Cir. 2004) (applying the same likelihood-of-confusion factors used in infringement litigation to assess the similarity of two marks in an appeal from an opposition proceeding); *Han Beauty, Inc. v. Alberto-Culver Co*., 236 F.3d 1333 (Fed. Cir. 2001) (same).

RE/MAX established a likelihood of confusion under § 32(1)(A) of the Lanham Act, 15 U.S.C. § 1114(1)(A). Under the § 2(d) cancellation analysis, the Trend Setter mark is also "likely

to cause confusion" with RE/MAX's senior marks.   RE/MAX's request for cancellation of Registration No. 3,222708 is granted.[13]

## VII.    The Defendants' Claim for Cancellation

The defendants urge this court to exercise its authority under § 37 of the Lanham Act and order the cancellation of RE/MAX's federal Trademark Registration No. 1,702,048, the tri-bar mark comprising three red-over-white-over-blue horizontal bars without a hot-air balloon.  The defendants raise three grounds: (1) the mark comprises or simulates a flag, which is prohibited by § 2(b), 15 U.S.C. § 1052(b); (2) RE/MAX has abandoned and/or "mutilated" its mark; and (3) the mark is generic.  (Docket Entry No. 11 at ¶¶ 105-110).  The defendants concede registration, which is prima facie evidence of the mark's validity.  *See* 15 U.S.C. § 1057(b); § 1115(a).  It is also undisputed that the mark has been used in commerce for over five years and achieved incontestability.  (Docket Entry No. 45 at 6).  Incontestable marks that have been used in commerce for over five years are nonetheless subject to the defenses enumerated in 15 U.S.C. § 1115(b), including that the mark is prohibited, has been abandoned, or is generic.  *See Pebble Beach Co.*, 942 F.Supp. at 1528 n.5; *see also American Rice*, 518, F.3d at 330, 330 n.25.

### A.    Whether RE/MAX's Registration No. 1,702,048 is Prohibited Under §1052(b)

The defendants urge this court to cancel RE/MAX's mark under § 2(b), 15 U.S.C. § 1052(b), which bars trademark registrations that comprise or simulate the flag of the United States or flags of foreign nations.  Section 2(b) provides:

---

[13] RE/MAX advanced as a second argument for cancellation that because the defendants never answered and denied RE/MAX's allegations in its amended complaint relating  to cancellation of Trend Setter's mark, (Docket Entry No. 20, Count IX), they were effectively admitted.  (Docket Entry No. 45 at 22).  Because this court grants cancellation on the merits, this argument is moot.

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register because of its nature unless it. . . .(b) Consists of or comprises the flag or coat of arms or other insignia of the United States or of any State or municipality, or of any foreign nation, or any simulation thereof.

15 U.S.C. § 1052(b).  A mark found to be barred under §1052 (b) can be cancelled at any time.  *See* 15 U.S.C. § 1064(3).  *The Trademark Manual of Examining Procedure* § 1204 defines flags in the context of § 2(b) as "specific designs formally adopted to serve as emblems of governmental authority."  Trademarks that "incorporate common elements of flags such as horizontal lines, crosses or stars but that are readily distinguishable from any of the flags of the nations" are not prohibited under § 2.  *In re Waltham Watch Co.*, 179 U.S.P.Q. 59, 60 (T.T.A.B. 1973).

The defendants first argue that the RE/MAX tri-bar design, Registration No. 1,702,048, must be cancelled because it "consists of the colors and the design of the flag of the United States in violation of Section 2(b) of the Trademark Act, 15 U.S.C. §1052(b)." (Docket Entry No. 11 at ¶ 79.) RE/MAX disagrees.  (Docket Entry No. 45 at 23-24).  It is clear that the RE/MAX trademark does not "consist of or comprise" the United States flag in its entirety and is not another "insignia of the United States." *See In re United States Dep't of the Interior*, 142 U.S. P.Q. 506, 507 (T.T.A.B. 1964).

It is also clear that the RE/MAX mark is not a "simulation" of the United States flag.  A mark is a "simulation" of a flag when it "gives the appearance or effect or has the characteristics" of a flag, as determined by a side-by-side comparison of the mark with the flag, as well as by consumers' general recollection of the flag's appearance.  *In re Advance Industrial Security, Inc.*, 194 U.S.P.Q. 344, 346 (T.T.A.B. 1977).  The applicant's intent is irrelevant.  *Id.*  Marks may "incorporate common elements of flags such as horizontal lines, crosses or stars" and yet still be

45

"readily distinguishable," so long as they are not "virtually identical" to a prohibited flag or symbol. *See Waltham Watch*., 179 U.S.P.Q. at 60.  RE/MAX's mark is "readily distinguishable" from the United States flag and does not give "the appearance, effect or characteristics" of the flag, which has thirteen thin red and white stripes and a blue box in the upper-left corner containing 50 stars.  *See Advance Industrial Security*, 194 U.S.P.Q. at 346; *Waltham Watch,* 179 U.S.P.Q. 59, 60 (T.T.A.B. 1973) (holding that a logo with stylized flags of several nations surrounding a globe is not a "simulation" of any foreign flag).  Nor does the RE/MAX mark comprise an "insignia of the United States" under § 2(b).  The Trademark Board has made it clear that "flags and coats of arms "are specific designs formally adopted to serve as emblems of governmental authority."  *Trademark Manual of Examining Procedure,* § 1204 (quoting *Dep't of the Interior*, 142 U.S. P.Q. at 507 (holding that the National Park Service's logo did not fall within the category of "or other insignia" and was a registrable mark)).  Unlike "the Great Seal of the United States, the Presidential Seal, and seals of government departments," which convey national authority, logos used only to identify a government service or facility fall outside the prohibitions of § 2(b) because they are not "emblems of national authority."  *Id.*  If the National Park Service logo is not an "emblem[] of national authority," neither is the tri-color bar used in the RE/MAX trademark.  *See Dep't of the Interior*, 142 U.S. P.Q. at 507.  The RE/MAX trademark is not a prohibited simulation of the flag or other insignia of the United States and the defendants cannot sustain a claim for cancellation on that basis.

The defendants' second argument is that the RE/MAX Registration No. 1,702,048 must be cancelled under §1052(b) because it comprises or is a "simulation" of  the flag of the Kingdom of the Netherlands or the flag of Luxembourg.  (Docket Entry No. 55 at ¶¶ 63-64).  The defendants concede that flags are defined for § 1052 (b) purposes as "specific designs formally adopted to serve

46

as emblems of governmental authority," *Trademark Manual of Examining Procedure*, § 1204. The

defendants argue the RE/MAX mark is a "simulation" of the flags of these two foreign nations

because the mark "gives the appearance or effect or has the characteristics of" these foreign flags.

*Id.* at ¶ 65 (citing *Waltham Watch*, 179 U.S.P.Q. at 60.) The defendants have submitted images of

these flags. Both are rectangles containing red-over-white-over-blue bars of equal size, like the

RE/MAX mark.

The relevant inquiry, however, is whether the average viewer would see the RE/MAX mark

as giving the "appearance or effect" of the flags of Netherlands and Luxembourg or as "hav[ing] the

characteristics" of those flags, or whether the mark is "readily distinguishable from" them. *See*

*Waltham Watch*, 179 U.S.P.Q. at 60. The Trademark Board has allowed or upheld the registration

of trademarks that incorporate only some elements of flags or that use stylized versions of flags. In

such cases, the Board has held that the mark was "readily distinguishable" from the actual flags and

that ordinary consumers would not perceive the mark as comprising or simulating the actual flags.

*See id.*; *Knorr-Nahrmittel A.G. v. Havland International, Inc.*, 206 U.S.P.Q. 827, 833 (T.T.A.B.

1980). If a mark is "virtually identical" to a flag or similar insignia when seen through the eyes of

the ordinary viewer, it should not be registered. *See In re Peter S. Herrick, P.A.*, 2009 WL 1741898,

*5 (T.T.A.B. Jun. 10, 2009).

While the RE/MAX mark contains the same colors as the flags of the Netherlands and

Luxembourg, ordinary viewers would not perceive the mark as representing those flags.[14] The

---

[14] It is instructive to consider the doctrine of foreign equivalents, used in trademark infringement litigation to determine whether allegedly infringing marks containing foreign words would be "likely to cause confusion" among consumers. Under the doctrine, marks using foreign terms that have the same meaning as senior, English-language marks should be held confusingly similar to the English marks if an "appreciable" segment of American consumers is familiar with the foreign language. *Palm Bay imports, Inc. v. Veuve Ponsardin*, 396 F.3d 1369, 1377 (Fed. Cir. 2005) (a court should take into account the identity in meaning between marks incorporating distinct languages "only when it is likely that the

RE/MAX mark is distinctive in presentation: it contains no poles or other indicators that it is a flag. As used in advertising materials such as real estate yard signs and business cards, the RE/MAX mark does not resemble a flag at all and does not give any indication to viewers that it represents a flag of any foreign nation. And most consumers of RE/MAX services do not know what the flags of Luxembourg or the Netherlands look like. There is no likelihood that consumers will confuse the RE/MAX logo with either of those flags. *See Knorr-Nahrmittel A.G.*, 206 U.S.P.Q. at 833.

The record shows that, as a matter of law, there is no basis to find the RE/MAX mark prohibited as a flag or symbol of either the United States or any foreign nation. The defendants' counterclaim for cancellation on this ground is denied.[15]

### B.    Whether RE/MAX Has Abandoned or Mutilated Registration No. 1,702,048

The defendants also argue that RE/MAX has abandoned and/or mutilated its tri-bar mark. Abandonment and mutilation are distinct objections to the validity of a trademark and are separately addressed.

The Lanham Act provides that "[a] mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127; *see also Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1078-79 (5th Cir.

---

ordinary American purchaser would stop and translate [the foreign word] into its English equivalent" (quotation marks removed)). Ordinary consumers would not stop and "translate" the RE/MAX mark into the flags of the Netherlands and Luxembourg or associate it with those nations, particularly in the context of RE/MAX advertising.

[15] The defendants' motion for leave to amend their counterclaim is denied as untimely and as futile. (Docket Entry No. 51).

1997).[16]  "Use" is defined as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  Abandonment may be a defense even against a party possessing an incontestable mark.  15 U.S.C. § 1115(b)(2).  But a party claiming a that trademark has been intentionally abandoned under § 1127 has a heavy burden. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir.1977); *see also American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 625 (5th Cir. 1963) ("Abandonment is in the nature of a forfeiture" and requires satisfying "burden of strict proof applicable in forfeiture cases").  A registration can be cancelled at any time if it is found to be abandoned.  15 U.S.C. § 1064(3).

The defendants argue that RE/MAX has discontinued its use of  Registration No. 1,702,048 for over three years.  (Docket Entry No. 55 at ¶¶ 70-71).  The defendants' only evidence that RE/MAX no longer uses its tri-bar marks is RE/MAX's publication, the RE/MAX Trademarks and Graphics Standards (11th Ed. 2005).  This publication provides a detailed description of the internal standards that RE/MAX affiliates must meet when using RE/MAX's marks on various types of advertising media.  (Docket Entry No. 55-2).  According to the defendants, the Standards "specifically and affirmatively prohibit[] the use of the Flag [tri-bar] Registration," showing that RE/MAX has discontinued use of the tri-bar marks for over three years and does not intend to use them in the foreseeable future.  (Docket Entry No. 55 at ¶ 70).

---

[16] Section 1127 also provides that a mark is to be abandoned: "2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph."  The defendants do not allege that RE/MAX "unintentionally" abandoned its tri-bar mark.  In any case, proving "unintentional abandonment" requires a showing that the mark has become generic or has lost its significance as a mark.  *Exxon Corp. v. Oxxford Clothes, Inc.* 109 F.3d at 1079.  As discussed in footnote 5, *supra*, the defendants cannot make such a showing.

The defendants' characterization of the RE/MAX Trademark and Graphics Standards is misleading. In the section laying out the requirements for the "RE/MAX Residential Yard Sign," the Standards state: "In addition to the horizontal bars, the sign must include the RE/MAX graphic-image balloon mark[.]" (Docket Entry No. 55-2 at 29). Many of the advertising media described in the Standards, including RE/MAX business cards, stationery, and yard signs use the tri-bar mark and do not contain balloons. The Standards indicate that the RE/MAX commercial design package relies mainly on the RE/MAX tricolor horizontal-bar composition as its distinguishing feature. (*Id.* at 38). The Standards describe the "Specialized Commercial Sign" (as opposed to the RE/MAX "Residential Yard Sign" or the "Traditional RE/MAX Commercial Sign") as containing "the tricolor horizontal-bar composition … reduced in size and [placed] in the upper left corner of the sign," with no balloon. (*Id.* at 40). Moreover, in contrast to the specific requirements for residential yard signs, the Standards require *all* RE/MAX advertising media, even those lacking balloons, to contain some version of the red, white, and blue horizontal bars. Advertising material is required to use the "RE/MAX colors," referred to as "Bright Red and Brilliant Blue" or "PMS 186" red and "Reflex Blue." (*Id.* at 25, 32-34, 39). Far from serving as prima facie evidence of three years of discontinued use of the tri-bar marks, the Standards show that RE/MAX continues to use the tri-bar marks in advertising. (*See id.* at 40).

The record contains other evidence that RE/MAX intends to continue to using the tri-bar mark for the foreseeable future. *See* 15 U.S.C. § 1127. RE/MAX's Standards identify their purpose as ensuring that "the various RE/MAX marks remain strong and also remain the exclusive property of RE/MAX International." (*Id.* at iv). RE/MAX has previously filed lawsuits to defend its red, white, and blue trademarks. *See, e.g., RE/MAX International, Inc. v. Citimaxx Corp.*, 2009 WL

1883035 (M.D.Fla. June 30, 2009) (denying defendant's motion to dismiss and staying case pending arbitration); *RE/Max International, Inc. v. Equity Max Realty, Inc.*, 2007 WL 1110590 (S.D.Cal. Apr. 3, 2007) (denying defendant's motion for judgment on the pleadings); *District RE/MAX North Central, Inc. v. Cook*, 64 Fed. Appx. 562 (7th Cir. 2003) (upholding summary judgment for RE/MAX against former franchisee on Lanham Act claim); *RE/MAX International, Inc. v. Quality Realty, Inc.,* 1999 WL 33257265, *2 (N.D. Ill. Feb. 19, 1999) (recommending contempt sanctions after entering judgment for RE/MAX on its trademark and unfair competition claims). Abandonment is a defense designed to deprive trademark owners of their rights when they do not properly protect or enforce their trademark rights. *See Kentucky Fried Chicken*, 549 F.2d at 387. The record shows that RE/MAX has made substantial efforts to protect its rights in its trademark. The defendants' counterclaim for cancellation based on abandonment fails as a matter of law.

The defendants' argument that this court should cancel RE/MAX's Registration No. 1,702,048 because RE/MAX has "mutilated" it is similarly unpersuasive. "'Mutilation' is a concept long recognized as a part of trademark registration case law." *Institut Nat. Des Appellations D'Origine v. Vintners Intern. Co*., Inc., 958 F.2d 1574, 1582 (Fed. Cir. 1992) (citing *In re Servel Inc*., 181 F.2d 192, 195, 85 U.S.P.Q. 257, 259-60 (1950)). Mutilation occurs when a trademark registrant registers only a part of the trademark as used in commerce, and the registered mark does not create a "separate commercial impression" from the actual commercial mark. 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 19:59 (2009). The PTO has rejected as a "mutilation" a registration for a word logo identical to the logo used on the registrant's products except for the deletion of a shadow effect and of a single word, "products." The logo "RAINARE products" with a shadow did not create a separate commercial impression from the registered mark, "RAINAIRE"

51

without a shadow. *See In re Schecter Bros. Modlar Corp.*, 182 U.S.P.Q. 694, 695 (T.T.A.B. 1974).

In this case, the defendants argue that RE/MAX's "true" trademark is the balloon mark required by the RE/MAX Trademark and Graphics Standards, and that by not including the RE/MAX balloon in Registration No. 1,702,048, RE/MAX has "mutilated" the mark. (Docket Entry No. 55 at ¶¶ 72-74). The defendants argue that the red-over-white-over-blue mark is not sufficiently distinct from the balloon marks to make a distinct impression on consumers.

The court considered a similar argument in *Institut Nat. Des Appellations D'Origine v. Vintners Intern. Co., Inc.*, 958 F.2d 1574 (Fed. Cir. 1992). That case involved a French government organization opposing a winemaker's trademark. The government organization claimed that the winemaker's mark, CHABLIS WITH A TWIST, was not protectable because it was a "mutilation" of the winemaker's "actual mark," CALIFORNIA CHABLIS WITH A TWIST, which appeared on the winemaker's wine labels. *Id.* at 1582. Besides the labels themselves, the challenger's evidence supporting its contention that the trademark registration had to contain the term "California" was that the Bureau of Alcohol, Tobacco, and Firearms (ATF) required the wine labels to include the word "California." *Id.* The Federal Circuit held that the ATF regulations were irrelevant to determining the winemaker's actual trademark. The court held the term "California" was not a part of the actual trademark and that there was no mutilation of that mark. *Id.* at 1582-83 (citation omitted). The court granted summary judgment against the challenger. *Id.* at 583.

The RE/MAX Trademark and Graphics Standards do not provide evidence that RE/MAX's "actual mark" is the balloon logo. On the contrary, as explained above, the Standards show that the RE/MAX balloon is not a necessary part of the RE/MAX trademark. The defendants fail to raise a genuine issue of fact as to abandonment or mutilation. This court denies their request for

52

cancellation on either of those grounds.

### C.    Whether RE/MAX's Registration No. 1,702,048 is Generic

In their answer, the defendants claim that RE/MAX's red, white and blue designs should be cancelled because they are generic.  (Docket Entry No. 11 at ¶ 107; Docket Entry No. 52 at ¶ 118). It is unclear whether they continue to pursue this argument in responding to the motion for summary judgment.

The defendants have produced no evidence to support their argument that the public perceives the red, white, and blue design as designating real estate brokerage services in general. (Docket Entry No. 45 at 23).  And the results of RE/MAX's survey provide evidence to the contrary, indicating that a significant number of consumers associate the red, white, and blue yard signs specifically with RE/MAX.  (Docket Entry No. 45 at 23; Docket Entry No. 47-4 at 8—10).  The defendants fail to raise an issue of fact as to whether Registration No. 1,704,048 is generic.  The defendants' request for cancellation on this ground is denied.

This court denies the defendants' counterclaim for cancellation of RE/MAX's trademark as a matter of law and enters summary judgment for RE/MAX on that claim

## VIII.  RE/MAX's Breach of Contract Claim Against Miller

On February 15, 2003, Miller entered into an Independent Contractor Agreement ("ICA") with RE/MAX Elite.[17]  In Paragraph 12 of the ICA, Miller promised that after her relationship with RE/MAX Elite terminated, she would "not infringe upon, use or imitate" RE/MAX's method of operation or its distinguishing characteristics, including its trademarks, service marks, "lawn signs,

---

[17] RE/MAX Elite has assigned its rights under the ICA to RE/MAX.  (Docket Entry No. 46 at 4).

color combinations and style." (Docket Entry No. 45-5).[18]  RE/MAX has moved for summary

judgment against Miller, alleging that her use of infringing Trend Setter yard signs is a material

breach of the ICA.  (Docket Entry No. 45 at 21).

Miller does not appear to dispute that she has violated the ICA.  She argues that Paragraph

12, the posttermination provision, is an unreasonable covenant not to compete.  (Docket Entry No.

55 at 17-19).  She contends that the provision is overbroad and vague in its language, as well as

unreasonable in scope, duration, and geographical reach, making it unenforceable under § 15.50(a)

of the Texas Business & Commerce Code.[19]  (Id).   Miller argues further that RE/MAX cannot

recover attorneys' fees and costs in enforcing the contract, despite a provision in the ICA allowing

it to do so.  (Id. at 19).  She contends that under § 15.51(c) of the Business and Commerce Code, she

---

[18] Paragraph 12 of the ICA, entitled "Restrictions on Subsequent Business Activity," states in relevant part:

> (B) .... Contractor acknowledges [RE/MAX] Regional's and/or International's exclusive right to its real estate systems its method of operation and its distinguishing characteristics, including, but not limited to, service marks, trademarks, trade names, copyrights, certification marks, designs, slogans, logos, telephone numbers, business cards, lawn signs, color combinations and style, names or other advertising copy now or hereafter displayed, used or becoming a part of the RE/MAX business. Contractor agrees neither to infringe upon, use or imitate said system or any of the above distinguishing characteristics after termination or expiration of this Agreement.

> (C) .... In the event Licensee and/or Regional are required to employ an attorney to enforce any of the covenants of this Section, or to institute legal proceedings, incident to such enforcement, then Contractor expressly covenants and agrees to pay, in addition to all other sums to which Contractor may be found liable, reasonable attorneys' fees, court costs, and litigation expenses incurred by Licensee and/or Regional.

(Docket Entry No. 45, Exhibit C).

[19]Section 15.50 reads in relevant part:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEXAS BUS. & COMM. CODE § 15.50.

is entitled to attorneys' fees and costs incurred in defending the claim.  (*Id*).

The threshold question is whether the ICA provision at issue is a covenant not to compete, subject to § 15.50(a).  Although not all posttermination restrictions fall within the statute,  *Guy Carpenter, Co., Inc. v. Provenzale*, 334 F.3d 459, 464-65 (5th Cir. 2003) (applying Texas law), a provision need not "expressly prohibit" competition to come within its reach.  *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 385 (Tex. 1991).  It is enough that the "practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete."  *Id.* at 385-86. In *Haass*, the Texas Supreme Court held that a provision requiring a departing partner of an accounting firm to pay a penalty to the firm if he provided accounting services to any of its clients was effectively a covenant not to compete.  *Id.*  The court saw no meaningful difference in the restrictions imposed by such a damages provision and an express covenant.  *Id.*  The provision was subject to § 15.50.  *Id.*

By contrast, Texas law does not treat nondisclosure agreements as covenants not to compete. *Provenzale*, 334 F.3d at 464-65; *CRC-Evans Pipeline Intern., Inc. v. Myers*, 927 S.W.2d. 259, 265 (Tex. App.–Houston [1st Dist] 1996, no writ).  A nondisclosure agreement does not prevent a former employee from competing with her former employer, but does prevent the former employee from using trade secrets or proprietary or confidential information.  *Myers*, 927 S.W.2d at 265.  Because nondisclosure agreements protect those legitimate interests of the employer rather merely restrain trade, "[n]on-disclosure covenants are more readily enforced than non-compete covenants."  *Id.*

Paragraph 12 of the ICA is largely a nondisclosure agreement. Its primary thrust is preventing former agents from disclosing or using RE/MAX trademarks, confidential information, or trade secrets, which RE/MAX is entitled to protect.  Miller points to the language prohibiting her

from using RE/MAX "color combinations and style"and from using distinguishing characteristics "now or hereinafter displayed" in arguing that the language is in fact a covenant not to compete.[20] (Docket Entry No. 55 at 17-19). This language does not make Paragraph 12 into a noncompete covenant subject to § 15.50. This language seeks to protect RE/MAX's business goodwill from diminution by former agents who might mislead consumers into thinking the agent is still affiliated with RE/MAX. Paragraph 12 does not prevent Miller from competing with RE/MAX for listings or clients, which she may do without any restrictions as to time or place. But she may not compete using a red, white, and blue sign that could be confusingly similar to the RE/MAX marks. That design is not essential to succeeding in the real estate business, such that "it inhibits competition virtually the same as a covenant not to compete." *Haas,* 818 S.W.2d at 385-86.

Because Paragraph 12 is not a covenant not to compete, it is not subject to the limitations of § 15.50(a). This court need not reform the contract to bring it in line with those statutory rules, leaving intact the terms of Paragraph 12. *Cf.* Tex. Bus. & Com. Code § 15.51 (requiring reformation for some covenants falling within section 15.50). The attorneys' fees provisions of § 15.51(c) do not apply; insofar as Miller has requested an award of fees or costs under that provision, her request is denied.

The record shows that Miller breached the ICA by using Trend Setter yard signs imitating RE/MAX's in their color combination and style. The record also shows that Miller breached the portion of Paragraph 12 barring infringement of the RE/MAX marks after the ICA terminated. (Docket Entry No. 45-5 at 8). The ICA provides for Miller to pay RE/MAX's attorneys' fees and

---

[20]As Miller notes, the term "color combinations" is not defined. But the plain meaning of the term, and the meaning given by RE/MAX during Miller's employment, is the distinctive color combination RE/MAX used in its advertising and other materials. It is clear that RE/MAX and considers bright shades of red, white and bright shades of blue the "RE/MAX colors." (Docket Entry No. 55-2 at 25).

litigation costs in any action RE/MAX brings to enforce the covenants in Paragraph 12.  (*Id.*)  *See*

*Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 126 (5th Cir. 1993) (enforcing an attorney's fees

and costs provision against a former franchisee in a suit for breach of a noncompete covenant in a

franchise agreement).  Miller is incorrect in arguing that the fee-shifting agreement in the ICA is

preempted by statute because Paragraph 12 does not fall under § 15.50.  (Docket Entry No. 55 at

19).

> RE/MAX's motion for summary judgment on the breach of contract claim against Miller is
granted.

## IX.    Conclusion and Order

> RE/MAX's motion for summary judgment is granted with respect to RE/MAX's trademark
infringement, unfair competition, and breach of contract claims.  RE/MAX's claim for cancellation
of Registration No. 3,222,708 is granted.  The defendants' claim for cancellation of Registration No.
1,702,048 is denied.  The defendants' motion for an extension of time to file their response to
RE/MAX's summary judgment motion is granted; the motion for leave to amend the answer is
denied.

> No later than **September 18, 2009**, the parties must advise the court of any remaining issues
and propose a timetable for resolving them or submit a proposed final judgment.

> SIGNED on September 3, 2009, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge